CRAMER *v.* UNITED STATES.

No. 13. Argued March 9, 1944. Reargued November 6, 1944.—
Decided April 23, 1945.

*Mr. Harold R. Medina,* with whom *Mr. John McKim Minton, Jr.* was on the brief, for petitioner.

*Solicitor General Fahy,* with whom *Mr. Chester T. Lane* was on the brief on the reargument and *Assistant Attorney General Tom C. Clark, Messrs. Chester T. Lane, Robert S. Erdahl, Edward G. Jennings* and *Walter J. Cummings, Jr.* were on the brief on the original argument, for the United States.

MR. JUSTICE JACKSON delivered the opinion of the Court.

Anthony Cramer, the petitioner, stands convicted of violating Section 1 of the Criminal Code, which provides: "Whoever, owing allegiance to the United States, levies war against them or adheres to their enemies, giving them aid and comfort within the United States or elsewhere, is guilty of treason." [1]

Cramer owed allegiance to the United States. A German by birth, he had been a resident of the United States since 1925 and was naturalized in 1936. Prosecution resulted from his association with two of the German saboteurs who in June 1942 landed on our shores from enemy submarines to disrupt industry in the United States and whose cases we considered in *Ex parte Quirin*, 317 U. S. 1. One of those, spared from execution, appeared as a government witness on the trial of Cramer. He testified that Werner Thiel and Edward Kerling were members of that sabotage crew, detailed their plot, and described their preparations for its consummation.

Cramer was conscripted into and served in the German Army against the United States in 1918. After the war he came to this country, intending to remain permanently. So far as appears, he has been of good behavior, never before in trouble with the law. He was studious and intelligent, earning $45 a week for work in a boiler room and living accordingly.

There was no evidence, and the Government makes no claim, that he had foreknowledge that the saboteurs were coming to this country or that he came into association with them by prearrangement. Cramer, however, had known intimately the saboteur Werner Thiel while the latter lived in this country. They had worked together,

[1] 18 U. S. C. § 1, derived from Act of April 30, 1790, c. 9, § 1, 1 Stat. 112.

4

roomed together, and jointly had ventured in a small and luckless delicatessen enterprise. Thiel early and frankly avowed adherence to the National Socialist movement in Germany; he foresaw the war and returned in 1941 for the purpose of helping Germany. Cramer did not do so. How much he sympathized with the doctrines of the Nazi Party is not clear. He became at one time, in Indiana, a member and officer of the Friends of New Germany, which was a predecessor of the Bund. However, he withdrew in 1935 before it became the Bund. He says there was some swindle about it that he did not like and also that he did not like their drilling and "radical activities." In 1936 he made a trip to Germany, attended the Olympic games, and saw some of the Bundsmen from this country who went there at that time for conferences with Nazi Party officials. There is no suggestion that Cramer while there had any such associations. He does not appear to have been regarded as a person of that consequence. His friends and associates in this country were largely German. His social life in New York City, where he recently had lived, seems to have been centered around Kolping House, a German-Catholic recreational center.

Cramer retained a strong affection for his fatherland. He corresponded in German with his family and friends there. Before the United States entered the war he expressed strong sympathy with Germany in its conflict with other European powers. Before the attack upon Pearl Harbor, Cramer openly opposed participation by this country in the war against Germany. He refused to work on war materials. He expressed concern about being drafted into our army and "misused" for purposes of "world conquest." There is no proof, however, except for the matter charged in the indictment, of any act or utterance disloyal to this country after we entered the war.

Coming down to the time of the alleged treason, the main facts, as related on the witness stand by Cramer, are not seriously in dispute. He was living in New York; and in response to a cryptic note left under his door, which did not mention Thiel, he went to the Grand Central Station. There Thiel appeared. Cramer had supposed that Thiel was in Germany, knowing that he had left the United States shortly before the war to go there. Together they went to public places and had some drinks. Cramer denies that Thiel revealed his mission of sabotage. Cramer said to Thiel that he must have come to America by submarine, but Thiel refused to confirm it, although his attitude increased Cramer's suspicion. Thiel promised to tell later how he came to this country. Thiel asked about a girl who was a mutual acquaintance and whom Thiel had engaged to marry previous to his going to Germany. Cramer knew where she was, and offered to and did write to her to come to New York, without disclosing in the letter that Thiel had arrived. Thiel said that he had in his possession about $3,600, but did not disclose that it was provided by the German Government, saying only that one could get money in Germany if he had the right connections. Thiel owed Cramer an old debt of $200. He gave Cramer his money belt containing some $3,600, from which Cramer was to be paid. Cramer agreed to and did place the rest in his own safe-deposit box, except a sum which he kept in his room in case Thiel should want it quickly.

After the second of these meetings Thiel and Kerling, who was present briefly at one meeting, were arrested. Cramer's expectation of meeting Thiel later and of bringing him and his fiancée together was foiled. Shortly thereafter Cramer was arrested, tried, and found guilty. The trial judge at the time of sentencing said:

"I shall not impose the maximum penalty of death. It does not appear that this defendant Cramer was aware

that Thiel and Kerling were in possession of explosives or other means for destroying factories and property in the United States or planned to do that.

"From the evidence it appears that Cramer had no more guilty knowledge of any subversive purposes on the part of Thiel or Kerling than a vague idea that they came here for the purpose of organizing pro-German propaganda and agitation. If there were any proof that they had confided in him what their real purposes were, or that he knew or believed what they really were, I should not hesitate to impose the death penalty."

Cramer's case raises questions as to application of the constitutional provision that "Treason against the United States shall consist only in levying War against them, or in adhering to their Enemies, giving them Aid and Comfort. No person shall be convicted of Treason unless on the Testimony of two Witnesses to the same overt Act, or on Confession in open Court." [2]

Cramer's contention may be well stated in words of Judge Learned Hand in *United States* v. *Robinson:* [3]

"Nevertheless a question may indeed be raised whether the prosecution may lay as an overt act a step taken in execution of the traitorous design, innocent in itself, and getting its treasonable character only from some covert and undeclared intent. It is true that in prosecutions for conspiracy under our federal statute it is well settled that any step in performance of the conspiracy is enough, though it is innocent except for its relation to the agreement. I doubt very much whether that rule has any application to the case of treason, where the requirement affected the character of the pleading and proof, rather than accorded a season of repentance before the crime should be complete. Lord Reading in his charge in

---

[2] Article III, § 3.

[3] 259 F. 685, 690 (S. D. N. Y. 1919).

*Casement's Case* uses language which accords with my understanding:

" 'Overt acts are such acts as manifest a criminal intention and tend towards the accomplishment of the criminal object. They are acts by which the purpose is manifested and the means by which it is intended to be fulfilled.' " [4]

The Government, however, contends for, and the court below has affirmed, this conviction upon a contrary principle.[5] It said: "We believe in short that no more need be laid for an overt act of treason than for an overt act of conspiracy . . . Hence we hold the overt acts relied on were sufficient to be submitted to the jury, even though they perhaps may have appeared as innocent on their face." A similar conclusion was reached in *United States* v. *Fricke;* [6] it is: "An overt act in itself may be a perfectly innocent act standing by itself; it must be in some manner in furtherance of the crime."

As lower courts thus have taken conflicting positions, or, where the issue was less clearly drawn, have dealt with the problem ambiguously,[7] we granted certiorari [8] and after argument at the October 1943 Term we invited

---

[4] This view was recently followed by Judge Clancy in District Court, in dismissing an indictment for treason. *United States* v. *Leiner,* S. D. N. Y. 1943 (unreported).

[5] *United States* v. *Cramer,* 137 F. 2d 888, 896.

[6] 259 F. 673, 677 (S. D. N. Y. 1919).

[7] "An overt act, in criminal law, is an outward act done in pursuance and in manifestation of an intent or design; an overt act in this case means some physical action done for the purpose of carrying out or affecting [sic] the treason." *United States* v. *Haupt,* 47 F. Supp. 836, 839 (N. D. Ill. 1942), reversed on other grounds, 136 F. 2d 661 (C. C. A. 7th, 1943).

"The overt act is the doing of some actual act, looking towards the accomplishment of the crime." *United States* v. *Stephan,* 50 F. Supp. 738, 742–43 n. (E. D. Mich. 1943).

[8] 320 U. S. 730.

8

reargument addressed to specific questions.[9]  Since our primary question here is the meaning of the constitutional provision, we turn to its solution before considering its application to the facts of this case.

I

When our forefathers took up the task of forming an independent political organization for New World society, no one of them appears to have doubted that to bring into being a new government would originate a new allegiance for its citizens and inhabitants.  Nor were they reluctant to punish as treason any genuine breach of allegiance, as every government time out of mind had done.  The betrayal of Washington by Arnold was fresh in mind.  They were far more awake to powerful enemies with designs on this continent than some of the intervening generations have been.  England was entrenched in Canada to the north and Spain had repossessed Florida to the south, and each had been the scene of invasion of the Colonies; the King of France had but lately been dispossessed in the Ohio Valley; Spain claimed the Mississippi Valley; and, except for the seaboard, the settlements were surrounded by Indians—not negligible as enemies themselves, and especially threatening when allied to European foes.  The proposed national government could not for some years become firmly seated in the tradition or in the habits of

[9] May 22, 1944.  Counsel for petitioner, although assigned by the trial court, has responded with extended researches.  The Solicitor General engaged scholars not otherwise involved in conduct of the case to collect and impartially to summarize statutes, decisions, and texts from Roman, Continental, and Canon law as well as from English, Colonial, and American law sources.  The part of the study dealing with American materials has been made available through publication in 58 Harv. L. Rev. 226 *et seq.*  Counsel have lightened our burden of examination of the considerable accumulation of historical materials.

the people. There is no evidence that the forefathers intended to withdraw the treason offense from use as an effective instrument of the new nation's security against treachery that would aid external enemies.

The forefathers also had suffered from disloyalty. Success of the Revolution had been threatened by the adherence of a considerable part of the population to the king. The Continental Congress adopted a resolution after a report by its "Committee on Spies" [10] which in effect declared that all persons residing within any colony owed allegiance to it, and that if any such persons adhered to the King of Great Britain, giving him aid and comfort, they were guilty of treason, and which urged the colonies to pass laws for punishment of such offenders "as shall be provably attainted of open deed." [11] Many of the colonies complied, and a variety of laws, mostly modeled

---

[10] The Committee included John Adams, Thomas Jefferson, John Rutledge, James Wilson, and Robert Livingston. See C. F. Adams, Life of John Adams in 1 Works of John Adams (1856) 224–25.

[11] *"Resolved,* That all persons abiding within any of the United Colonies, and deriving protection from the laws of the same, owe allegiance to the said laws, and are members of such colony; and that all persons passing through, visiting, or make [sic] a temporary stay in any of the said colonies, being entitled to the protection of the laws during the time of such passage, visitation or temporary stay, owe, during the same time, allegiance thereto:

"That all persons, members of, or owing allegiance to any of the United Colonies, as before described, who shall levy war against any of the said colonies within the same, or be adherent to the king of Great Britain, or others the enemies of the said colonies, or any of them, within the same, giving to him or them aid and comfort, are guilty of treason against such colony:

"That it be recommended to the legislatures of the several United Colonies, to pass laws for punishing, in such manner as to them shall seem fit, such persons before described, as shall be provably attainted of open deed, by people of their condition, of any of the treasons before described." 5 Journals of the Continental Congress (1906) 475.

on English law, resulted.[12]   Some of the legislation in later
years became so broad and loose as to make treason of

[12] Nine states substantially adopted the recommendation of the
Congress: Delaware, Massachusetts, New Hampshire, New Jersey,
New York, North Carolina, Pennsylvania, Rhode Island, Virginia.
(The Virginia law, though it did not copy in full the recommendation
of Congress, was drawn by Jefferson, among others, and hence prob-
ably can be regarded as originating in the same source as the others.)
Three states had basic treason statutes not patterned on the Con-
gressional model, one antedating the latter: Connecticut, Maryland,
South Carolina.   Georgia is not found to have enacted any general
treason statute, although it passed a number of separate acts of
attainder.

The Maryland act declared that "the several crimes aforesaid shall
receive the same constructions that have been given to such of the
said crimes as are enumerated in the statute of Edward the third, com-
monly called the statute of treasons."   None of the statutes contained
negative language, limiting the definition of treason expressly to that
set forth in the statute.   In general, too, they added to the definition
of the model recommended by Congress other specific kinds of trea-
son.   Thus a number defined treason as including conspiracy to levy
war.   Conspiracy to adhere to the enemy and give aid and comfort
was also included in several, or incorporated by separate acts.   Much
explicit attention was given to the problem of contact with the enemy.
Conveying of intelligence or carrying on of correspondence with the
enemy were expressly mentioned.   One typical provision declared
guilty of treason those persons who were "adherent to  .  .  .  the enemies
of this State within the same, or to the Enemies of the United States
.  .  . giving to  .  .  . them Aid or Comfort, or by giving to  .  .  . them
Advice or Intelligence either by Letters, Messages, Words, Signs or
Tokens, or in any way whatsoever, or by procuring for, or furnishing
to  .  .  . them any Kind of Provisions or Warlike Stores . . ."   Other
provisions referred to "joining their Armies," "inlisting or persuading
others to inlist for that Purpose," "furnishing Enemies with Arms or
Ammunition, provision or any other Articles for such their Aid or
Comfort," "wilfully betraying, or voluntarily yielding or delivering
any vessel belonging to this State or the United States to the Ene-
mies of the United States of America"; and to persons who "have
joined, or shall hereafter join the Enemies of this State, or put them-
selves under the Power and Protection of the said Enemies, who shall
come into this State and rob or plunder any Person or Persons of

mere utterance of opinion.[13]  Many a citizen in a time of
unsettled and shifting loyalties was thus threatened under

their Goods and Effects, or shall burn any Dwelling House or other
Building, or be aiding or assisting therein," or who should maliciously
and with an intent to obstruct the service dissuade others from enlist-
ing, or maliciously spread false rumors concerning the forces of either
side such as to alienate the affections of the people from the Govern-
ment "or to terrify or discourage the good Subjects of this State, or
to dispose them to favor the Pretensions of the Enemy," or who "shall
take a Commission or Commissions from the King of Great Britain,
or any under his Authority, or other the Enemies of this State, or the
United States of America."

A number of the statutes required "the testimony of two lawful and
credible witnesses."  But the requirement was not linked to the
proof of overt acts, and there was no suggestion of the type of pro-
vision later embodied in the Constitution.  Supplementary acts
creating special treasonable offenses tended to omit any requirement
as to quantum of proof.

See Hurst, *op. cit. supra,* 58 Harv. L. Rev. at 248 *et seq.*

[13] For example, the New York Act of March 30, 1781, after reciting
that it was necessary to make further provision respecting treason
in order to prevent adherence to the king, made it a felony to declare
or maintain "that the King of Great Britain hath, or of Right ought
to have, any Authority, or Dominion, in or over this State, or the
Inhabitants thereof," or to persuade or attempt to persuade any
inhabitant to renounce allegiance to the State or acknowledge allegiance
to the king, or to affirm one's own allegiance to the king.  A person con-
victed was to "suffer the Pains and Penalties prescribed by Law in Cases
of Felony without Benefit of Clergy," except that the court might,
instead of prescribing death, sentence to three years' service on an
American warship.  Laws of the State of New-York (Poughkeepsie,
1782) 4th Sess., Ch. XLVIII.  Virginia imposed a fine not exceed-
ing £20,000, and imprisonment up to five years "if any person re-
siding or being within this commonwealth shall . . . by any word,
open deed, or act, advisedly and willingly maintain and defend the
authority, jurisdiction, or power, of the king or parliament of Great
Britain, heretofore claimed and exercised within this colony, or shall
attribute any such authority, jurisdiction, or power, to the king or
parliament of Great Britain . . ."  Laws, October, 1776, Ch. V, 9
Hening, Statutes at Large (1823) 170.  See also Hurst, *op. cit. supra,*
58 Harv. L. Rev. at 265–67.

English law which made him guilty of treason if he adhered to the government of his colony and also under colonial law which made him guilty of treason if he adhered to his king.[14] Not a few of these persons were subjected to confiscation of property or other harsh treatment by the Revolutionists under local laws; none, however, so far as appears, to capital punishment.[15]

Before this revolutionary experience there were scattered treason prosecutions in the colonies,[16] usually not well reported. Some colonies had adopted treason statutes modeled on English legislation.[17] But the earlier colonial experience seems to have been regarded as of

---

[14] A similar situation prevailed during the Civil War, when treason prosecutions were instituted against citizens of some southern states for treason to the state, consisting of adherence to the United States. See Robinson, Justice in Grey, pp. 176, 199, 201, 202, 270, 289, 380, 385, 408.

[15] See Hurst, *Treason in the United States* (1944), 58 Harv. L. Rev. 226, 268–71. Although these acts, dealing with withdrawal to enemy territory, imposed in general only forfeiture and banishment, some did reinforce these penalties with the threat of death if the person should later be found within the state. *Id.*, 272.

[16] The only pre-Revolutionary treason trial of which there is an extensive record is *King* v. *Bayard* (1702), a New York prosecution under an Act of May 6, 1691, which made it treason "by force of arms or otherwise to disturb the peace good and quiet of this their Majestyes Government as it is now Established." (The act was thought by the home authorities to be objectionably broad and vague and was later repealed.) See The Trial of Nicholas Bayard, 14 Howell's State Trials 471; 10 Lawson, American State Trials, 518; Hurst, *op. cit. supra*, 58 Harv. L. Rev. at 233. For other material on colonial treason prosecutions, see Hurst, *op. cit. supra*, 58 Harv. L. Rev. at 234, n. 15.

[17] In the early part of the colonial period, charters and grants gave royal governors authority to use martial law for suppression of "rebellion," "sedition," and "mutiny," and references to treason were not in the traditional language. A provision of the General Laws of New Plimouth Colony, 1671, is representative:

"3. Treason against the Person of our Soveraign Lord the King,

a piece with that of England and appears not to have much influenced the framers in their dealings with the subject.

However, their experience with treason accusations had been many-sided. More than a few of them were descend-

---

the State and Common-wealth of England, shall be punished by death.

"4. That whosoever shall Conspire and Attempt any Invasion, Insurrection, or Publick Rebellion against this Jurisdiction, or the Surprizal of any Town, Plantation, Fortification or Ammunition, therein provided for the safety thereof, or shall Treacherously and Perfidiously Attempt and Endeavor the Alteration and Subversion of the Fundamental Frame and Constitutions of this Government; every such Person shall be put to Death."

But the bulk of colonial legislation prior to the Revolution drew extensively on English law, especially the statute 25 Edward III. Some of the acts substantially adopted the language of the latter statute, with additions, and some simply declared that the offense of treason should follow the English law. With the exception of Georgia and New Jersey, all the colonies eventually adopted one or the other type statute. In addition, the English law of treason itself applied, to an undefined extent, and several colonial acts were disallowed on the theory that they covered ground already occupied by the mother country's legislation. The colonies which enacted their own statutes patterned after 25 Edward III did not narrow its terms. Several expressly included the treason of compassing the death of the king, and a couple even made an analogous offense of compassing the death of the proprietor. The offense of levying war against the king was given a broad definition; some of the colonies expressly included various forms of "constructive" levying of war which had been put into the English statute by judicial construction, in general extending the crime to domestic disturbances; and some of the statutes made conspiracy to levy war sufficient to constitute the crime of levying war. Some specific attention was given in separate legislation at various times to contact with the enemy, legislation comparable to that subsequently enacted during the Revolutionary period.

Most of the colonial treason acts contained two-witness requirements, without the additional qualification later adopted in the Constitution, that they must be witnesses to the same overt act, although it was required that they be witnesses to the same general kind of treason.

See generally Hurst, *op. cit. supra*, 58 Harv. L. Rev. at 226–45.

ants of those who had fled from measures against sedition and its ecclesiastic counterpart, heresy. Now the treason offense was under revision by a Convention whose members almost to a man had themselves been guilty of treason under any interpretation of British law.[18] They not only had levied war against their king themselves, but they had conducted a lively exchange of aid and comfort with France, then England's ancient enemy. Every step in the great work of their lives from the first mild protests against kingly misrule to the final act of separation had been taken under the threat of treason charges.[19] The Declaration of Independence may seem cryptic in denouncing George III "for transporting us beyond Seas to be tried for pretended offenses" but the specific grievance was recited by the Continental Congress nearly two years before in saying that ". . . it has lately been resolved in Parliament, that by force of a statute, made in the thirty-fifth year of the reign of king Henry the eighth, colonists may be transported to England, and tried there upon accusations for treasons, and misprisions, or concealments

[18] "The men who framed that instrument remembered the crimes that had been perpetrated under the pretense of justice; for the most part they had been traitors themselves, and having risked their necks under the law they feared despotism and arbitrary power more than they feared treason." 3 Adams, History of the United States, 468.

"Every member of that Convention—every officer and soldier of the Revolution from Washington down to private, every man or woman who had given succor or supplies to a member of the patriot army, everybody who had advocated American independence . . . could have been prosecuted and might have been convicted as 'traitors' under the British law of constructive treason." 3 Beveridge, Life of John Marshall, 402, 403.

[19] This was doubtless the meaning of Franklin's quip at the signing of the Declaration of Independence that if the signers did not hang together they should hang separately. It was also the meaning of the cries of "Treason" which interrupted Patrick Henry in the speech in the Virginia House of Burgesses evoking the famous reply "If this be treason, make the most of it."

of treasons committed in the colonies; and by a late statute, such trials have been directed in cases therein mentioned."[20]

The Convention numbered among its members men familiar with government in the Old World, and they looked back upon a long history of use and abuse of the treason charge.[21]  The English stream of thought con-

---

[20] 1 Journals of the Continental Congress, 65.  See also 1 Burnett, ed., Letters of Members of the Continental Congress (1921) 43, 44, n. 36.

[21] The men who were responsible for framing our Constitution were influenced by eighteenth century liberal thought from both French and English sources.  French influences, more philosophical than legal in character, were particularly strong with Franklin, who took a significant part in framing the treason clause.  Franklin had been a member of the French Academy of Sciences since 1772 and had many friends among French intellectuals.  He spent much time in England and in France, to which he was sent by the Continental Congress as Commissioner in 1776.  He remained until 1783, when he signed the Treaty of Peace with England, and thereafter until 1785 as Minister to France.  Becker, *Franklin*, 6 Dictionary of American Biography 585; 9 Encyclopedia Britannica (14th ed.) 693.  Jefferson, a strong influence with the men of that period, was sent to France by the Continental Congress to assist Franklin, remaining there from 1784 to 1789, succeeding Franklin in 1785 as Minister.  Jefferson was so closely in touch with French revolutionary thought that in July 1789 he was invited to assist in the deliberations of the Committee of the French National Assembly to draft a Constitution, but declined out of respect for his position.  See Malone, *Jefferson*, 10 Dictionary of American Biography 17; 12 Encyclopedia Britannica (14th ed.) 988.  See also, generally, Chinard, Thomas Jefferson, The Apostle of Americanism.  Best known in America of the French writings was Montesquieu's L'Esprit des Lois, which appeared in French in 1748.  (An English edition was published in London in 1750.)  Book 12 thereof was devoted to his philosophical reactions to the abuses of treason.  It is hardly a coincidence that the treason clause of the Constitution embodies every one of the precepts suggested by Montesquieu in discussing the excesses of ancient and European history.

Some of his precepts were: "If the crime of high treason be indeterminate, this alone is sufficient to make the government degenerate

cerning treasons began to flow in fairly definable channels in 1351 with the enactment of the great Treason Act, 25 Edw. III, Stat. 5, Ch. 2.[22]  That was a monumental piece

into arbitrary power." (Book 12, Ch. 7, Of the Crime of High Treason.)  "The laws do not take upon them to punish any other than overt acts." (Book 12, Ch. 11, Of Thoughts.)  "Nothing renders the crime of high treason more arbitrary than declaring people guilty of it for indiscreet speeches. . . . Words do not constitute an overt act; they remain only in idea. . . .  Overt acts do not happen every day; they are exposed to the eye of the public; and a false charge with regard to matters of fact may be easily detected.  Words carried into action assume the nature of that action.  Thus a man who goes into a public market-place to incite the subject to revolt, incurs the guilt of high treason, because the words are joined to the action, and partake of its nature.  It is not the words that are punished but an action in which the words are employed." (Book 12, Ch. 12, Of indiscreet Speeches.)  "Those laws which condemn a man to death on the deposition of a single witness, are fatal to liberty." (Book 12, Ch. 3, Of The Liberty of the Subject.)

Both French and English influences on American thought as shown by Jefferson's writings are traced by Perry, Puritanism and Democracy (1945) 126, 130, 134, 158, 182, 184, 185.

[22] *"Declaration what offences shall be adjudged treason.* Item, whereas divers opinions have been before this time in what case treason shall be said, and in what not; the King, at the request of the lords and of the commons, hath made a declaration in the manner as hereafter followeth, that is to say; when a man doth compass or imagine the death of our lord the King, or of our lady his queen or of their eldest son and heir; or if a man do violate the King's companion, or the King's eldest daughter unmarried, or the wife the King's eldest son and heir; or if a man do levy war against our lord the King in his realm, or be adherent to the King's enemies in his realm, giving to them aid and comfort in the realm, or elsewhere, and thereof be probably attainted of open deed by the people of their condition: *And if a man counterfeit the King's great or privy seal, or his money; and if a man bring false money into this realm, counterfeit to the money of England, as the money called lushburgh, or other, like to the said money of England, knowing the money to be false, to merchandise or make payment in deceit of our said lord the King and of his people;* and if a man slea the chancellor, treasurer, or the King's justices of the one bench or the other, justices in eyre, or justices of assise, and

of legislation several times referred to in the deliberations of the Convention. It cut a bench-mark by which the English-speaking world tested the level of its thought on the subject [23] until our own abrupt departure from it in

all other justices assigned to hear and determine, being in their places, doing their offices: and it is to be understood, that in the cases above rehearsed, that ought to be judged treason which extends to our lord the King, and his royal majesty: And of such treason the forfeiture of the escheats pertaineth to our sovereign lord, as well as of the lands and tenements holden of other, as of himself: *And moreover there is another manner of treason, that is to say, when a servant slayeth his master, or a wife her husband, or when a man secular or religious slayeth his prelate, to whom he oweth faith and obedience; and of such treason the escheats ought to pertain to every lord of his own fee.* And because that many other like cases of treason may happen in time to come, which a man cannot think or declare at this present time; it is accorded, that if any other case, supposed treason, which is not above specified, doth happen before any justices, the justices shall tarry without any going to judgement of the treason, till the cause be shewed and declared before the King and his Parliament, whether it ought to be judged treason or other felony. And if percase any man of this realm ride armed covertly or secretly with men of arms against any other, to slay him, or rob him, or take him, or retain him till he hath made fine or ransom for to have his deliverance, it is not the mind of the King nor his council, that in such case it shall be judged treason but shall be judged felony or trespass, according to the laws of the land of old time used, and according as the case requireth." 4 Halsbury's Statutes of England 273.

[23] Stephen said of it: "In quiet times it is seldom put in force, and if by any accident it is necessary to apply it, the necessity for doing so is obvious. For revolutionary periods it is obviously and always insufficient, and at such times it is usually supplemented by enactments which ought to be regarded in the light of war measures, but which are usually represented by those against whom they are directed as monstrous invasions of liberty. The struggle being over, the statute of 25 Edw. 3 is reinstated as the sole definition of treason, and in this way it has become the subject of a sort of superstitious reverence." 2 Stephen, History of the Criminal Law of England (1883) 250–51; see also 3 Holdsworth (4th ed. 1935) 287.

Blackstone says: "But afterwards, between the reign of Henry

1789, and after 600 years it still is the living law of treason in England. Roger Casement in 1917 forfeited his life for violating it.[24] We, of course, can make no independent judgment as to the inward meanings of the terms used in a six-century-old statute, written in a form of Norman French that had become obsolete long before our Revolution. We can read this statute only as our forebears read it—through the eyes of succeeding generations of English judges, to whom it has been the core of all decision, and of common-law commentators, to whom it has been the text.[25]

the fourth and queen Mary, and particularly in the bloody reign of Henry the eighth, the spirit of inventing new and strange treasons was revived; among which we may reckon the offences of clipping money; breaking prison or rescue, when the prisoner is committed for treason; burning houses to extort money; stealing cattle by Welshmen; counterfeiting foreign coin; wilful poisoning; execrations against the king; calling him opprobrious names by public writing; counterfeiting the sign manual or signet; refusing to abjure the pope; deflowering, or marrying without the royal licence, any of the king's children, sisters, aunts, nephews, or nieces; bare solicitation of the chastity of the queen or princess, or advances made by themselves; marrying with the king, by a woman not a virgin, without previously discovering to him such her unchaste life; judging or *believing* (manifested by any overt act) the king to have been lawfully married to Anne of Cleve; derogating from the king's royal stile and title; impugning his supremacy; and assembling riotously to the number of twelve, and not dispersing upon proclamation . . ." 4 Blackstone 86–87.

[24] *Rex* v. *Casement,* 1 K. B. 98 (1917); Knott, Trial of Roger Casement, 184, 185.

[25] Chief among these were Coke and Blackstone. Coke emphasized the salutary effects of the Statute of Edward III in limiting treason prosecution and strongly emphasized the overt-act requirement, probably quoting Bracton. Institutes of the Laws of England, 5th Ed. (1671) Part III, 14. He used as examples overt acts which of themselves appear to evidence treasonable intent. *Id.,* 2, 3, and 14. See 1 Hale, History of the Pleas of the Crown (1736) 86, 259. But we cannot be sure whether this was intended to imply that acts from

Adjudicated cases in English history generally have dealt with the offense of compassing the monarch's death;

which intent would be less evident would suffice. Other authors known on this side of the water leave us with little light on our particular problem.

Hale (History of the Pleas of the Crown, Emlyn ed. London, 1736) frequently uses terminology, found in Coke and earlier writers, which might mean that the function of an overt act is to prove intent, saying that the overt act is to "manifest" or "declare" the compassing of the king's death, and so forth. *Id.*, 109. But, as in the other writers, the statements are usually open as well to the interpretation that the act must show translation of thought into action. In the latter sense, the act "declares" intent in that it shows, in the light of other evidence, that the defendant's thoughts were not mere idle desires. This is a different thing from saying that the overt act must of itself display an unambiguously traitorous character. Elsewhere Hale gives some support to the view that the act may itself be of an innocent character. Dealing with the principle that words alone cannot be an overt act, he says that "words may expound an overt-act to make good an indictment of treason of compassing the king's death, which overt-act possibly of itself may be indifferent and unapplicable to such an intent; and therefore in the indictment of treason they may be joined with such an overt-act, to make the same applicable and expositive of such a compassing." *Id.*, 115. He also declares that the mere meeting of persons with the intent of plotting the king's death is a sufficient overt-act for the treason of compassing the king's death. *Id.*, 108, 109. These remarks, however, deal only with compassing the king's death, and little light is given as to the overt act in connection with levying war and adhering to the enemy. With Coke, Hale takes the position that a mere meeting of persons to conspire, though sufficient under the compassing clause, is not sufficient for the levying-of-war clause. *Id.*, 130.

Foster's view of the overt act does not seem materially different from Hale's. (A Report of Some Proceedings on the Commission for the Trial of the Rebels in the Year 1746 in the County of Surry; and of other Crown Cases, 2d ed. 1791.) "Overt acts undoubtedly do discover the man's intentions; but, I conceive, they are not to be considered merely as evidence, but as the *means made use of to effectuate the purposes of the heart* . . . though in the case of the King overt-acts of less malignity, and having a more remote tendency to his destruction, are, with great propriety, deemed treasonable; yet still

only eleven reported English cases antedating the Constitution are cited as involving distinct charges of adherence to the king's enemies.[26]  When constructive treasons were not joined on the face of the indictment, it is not possible to say how far they were joined in the minds of the judges.  No decision appears to have been a factor in the deliberations of our own Constitutional Convention.  Nor does any squarely meet our issue here, and for good reason—the Act of Edward III did not contain the two-witnesses-to-the-same-overt-act requirement which precipitates the issue here.

Historical materials are, therefore, of little help; necessity as well as desire taught a concept that differed from all historical models in the drafting of our treason clause. Treason statutes theretofore had been adapted to a society in which the state was personified by a king, on whose person were focused the allegiances and loyalties of the subject.  When government was made representative of the whole body of the governed, there was none to say "I

---

they are considered as *means to affectuate* [sic], not barely *as evidence* of the treasonable purpose."  Foster also repeats the assertion that the mere meeting of persons with intent to plan the king's death is a sufficient overt act.  *Id.*, 195.  However, his discussion, too, is confined to the treason of compassing, and he says little that is helpful about levying war and adhering.

[26] These are: Trial of Sir Nicholas Throckmorton, 1 How. St. Tr. 869 (1 Mary, 1554); Trial of Sir Richard Grahme (Lord Preston's Case), 12 How. St. Tr. 645 (2 William & Mary, 1691); Trial of Sir John Freind, 13 How. St. Tr. 1, 4, 11 (8 William III, 1696); Trial of Sir William Parkyns, 13 How. St. Tr. 63, 67 (8 William III, 1696); Trial of Peter Cook, 13 How. St. Tr. 311, 346 (8 William III, 1696); Trial of Captain Vaughan, 13 How. St. Tr. 485 (8 William III, 1696); Trial of William Gregg, 14 How. St. Tr. 1371 (6 Anne, 1708); Trial of James Bradshaw, 18 How. St. Tr. 415 (20 George II, 1746); Trial of Dr. Hensey, 19 How. St. Tr. 1341 (32 George II, 1758); Trial of Francis De la Motte, 21 How. St. Tr. 687 (21 George III, 1781); and the Trial of David Tyrie, 21 How. St. Tr. 815 (22 George III, 1782).

am the State" and a concept of treason as compassing or imagining a ruler's death was no longer fitting. Nor can it be gainsaid that the revolutionary doctrine that the people have the right to alter or abolish their government relaxed the loyalty which governments theretofore had demanded—dangerously diluted it, as the ruling classes of Europe thought, for in their eyes the colonists not only committed treason, they exalted it.[27] The idea that loyalty will ultimately be given to a government only so long as it deserves loyalty and that opposition to its abuses is not treason[28] has made our government tolerant of opposition based on differences of opinion that in some parts of the world would have kept the hangman busy. But the basic law of treason in this country was framed by men who, as we have seen, were taught by experience and by history to fear abuse of the treason charge almost as much as they feared treason itself. The interplay in

[27] Philip Guedalla characterizes the figures of the American Revolution as they occur in British legend: "There they are oddly shrunken; they dwindle into a provincial pettiness; and their voices monotonously intone the dreary formulæ of sedition." Fathers of the Revolution, p. 8.

[28] Mr. Jefferson had referred to the Statute of Edward III as "done to take out of the hands of tyrannical Kings, and of weak and wicked Ministers, that deadly weapon, which constructive treason had furnished them with, and which had drawn the blood of the best and honestest men in the kingdom." 1 Writings of Thomas Jefferson (Library ed. 1903) 215.

Later, as Secretary of State, he wrote: "Treason . . . when real, merits the highest punishment. But most codes extend their definitions of treason to acts not really against one's country. They do not distinguish between acts against the *government*, and acts against the *oppressions of the government;* the latter are virtues; yet they have furnished more victims to the executioner than the former; because real treasons are rare; oppressions frequent. The unsuccessful strugglers against tyranny, have been the chief martyrs of treason laws in all countries." 8 Jefferson's Writings 332. Compare 7th Annual Message, 1807, 3 Jefferson's Writings 451, 452.

the Convention of their two fears accounts for the problem which faces us today.

## II

We turn then to the proceedings of the Constitutional Convention of 1787 so far as we have record of them. The plan presented by Pinckney evidently proposed only that Congress should have exclusive power to declare what should be treason and misprision of treason against the United States.[29] The Committee on Detail, apparently not specifically instructed on the subject, reported a draft Constitution which left no such latitude to create new treasons. It provided that: "Treason against the United States shall consist only in levying war against the United States, or any of them; and in adhering to the enemies of the United States, or any of them. The Legislature of the United States shall have power to declare the punishment of treason. No person shall be convicted of treason, unless on the testimony of two witnesses. No attainder of treason shall work corruption of bloods, nor forfeiture, except during the life of the person attainted."[30]

This clause was discussed on August 20, 1787. Mr. Madison, who opened the discussion, "thought the definition too narrow. It did not appear to go as far as the Stat. of Edwd. III. He did not see why more latitude might not be left to the Legislature. It wd. be as safe in the hands of State legislatures; and it was inconvenient to bar a discretion which experience might enlighten, and which might be applied to good purposes as well as be abused."[31] Mr. Mason was in favor of following the language of the Statute of Edward III. The discussion shows some confusion as to the effect of adding the words "giving them aid and comfort," some thinking their effect restrictive

---

[29] 2 Farrand, Records of the Federal Convention of 1787, 136.

[30] Art. VII, § 2, of draft reported August 6, 1787. 2 Farrand 182.

[31] The debates are at 2 Farrand 345–50.

and others that they gave a more extensive meaning. However, "Col. Mason moved to insert the words 'giving (them) aid comfort' as restrictive of 'adhering to their Enemies, &c'—the latter he thought would be otherwise too indefinite." The motion prevailed.

Mr. Dickenson "wished to know what was meant by the 'testimony of two witnesses', whether they were to be witnesses to the same overt act or to different overt acts. He thought also that proof of an overt act ought to be expressed as essential to the case." Doctor Johnson also "considered . . . that something should be inserted in the definition concerning overt acts."

When it was moved to insert "to the same overt act" after the two-witnesses requirement, Madison notes that "Doc'r Franklin wished this amendment to take place—prosecutions for treason were generally virulent; and perjury too easily made use of against innocence." James Wilson observed that "Much may be said on both sides. Treason may sometimes be practiced in such a manner, as to render proof extremely difficult—as in a traitorous correspondence with an Enemy." [32] But the motion carried.

By this sequence of proposals the treason clause of the Constitution took its present form. The temper and attitude of the Convention toward treason prosecutions is unmistakable. It adopted every limitation that the practice of governments had evolved or that politico-legal philos-

[32] James Wilson was not unlikely one of the authors of the treason clause, as a member of the Committee on Detail. He had participated in the Pennsylvania treason trials in 1778 as one of the defense counsel (*Respublica* v. *Malin,* 1 Dall. 33 (Pa. O. & T.), *Respublica* v. *Carlisle, id.* 35, *Respublica* v. *Roberts, id.* 39). In the Pennsylvania ratifying convention he made detailed statements in praise of the clause without its having been challenged. 2 Elliott, Debates, 469, 487. Later, he devoted a lecture to the clause in his law course delivered at the College of Philadelphia in 1790 and 1791. 3 Works of Hon. James Wilson (Bird Wilson, ed. 1804) 95–107.

24

ophy to that time had advanced.[33] Limitation of the treason of adherence to the enemy to cases where aid and comfort were given and the requirement of an overt act were both found in the Statute of Edward III, praised in the writings of Coke and Blackstone, and advocated in Montesquieu's *Spirit of Laws*. Likewise, the two-witness requirement had been used in other statutes,[34] was advocated by Montesquieu in all capital cases,[35] and was a familiar precept of the New Testament [36] and of Mosaic law.[37] The framers combined all of these known protections and added two of their own which had no precedent. They wrote into the organic act of the new government a prohibition of legislative or judicial creation of new treasons. And a venerable safeguard against false testimony was given a novel application by requiring two witnesses to the same overt act.

Distrust of treason prosecutions was not just a transient mood of the Revolutionists. In the century and a half of our national existence not one execution on a federal treason conviction has taken place. Never before has this Court had occasion to review a conviction. In the few cases that have been prosecuted the treason clause has had its only judicial construction by individual Justices of this Court presiding at trials on circuit or by dis-

---

[33] The convention did reject proposals that the states be denied authority to define treason against themselves and that participation in a civil war between a state and the United States be excepted. See 2 Farrand 345, 348–49; 3 *id.* 223.

[34] See note 16, *supra;* see also 9 Holdsworth (2d ed. 1938) 203–211.

[35] L'Esprit des Lois, Book XII, Chap. III.

[36] ". . . take with thee one or two more, that in the mouth of two or three witnesses every word may be established." Matt. xviii, 16.

[37] "One witness shall not rise up against a man for any iniquity, or for any sin, in any sin that he sinneth: at the mouth of two witnesses, or at the mouth of three witnesses, shall the matter be established." Deut. xix, 15.

trict or circuit judges.[38]  After constitutional require-
ments have been satisfied, and after juries have convicted

[38] The following is a summary, taken from the Appendix to the Gov-
ernment's brief, of all cases in which construction of the treason clause
has been involved, omitting grand jury charges and cases in which
interpretation of the clause was incidental:

Whiskey Rebellion cases: *United States* v. *Vigol,* 28 Fed. Cas. 376,
No. 16,621 (C. C. D. Pa. 1795), *United States* v. *Mitchell,* 26 Fed.
Cas. 1277, No. 15,788 (C. C. D. Pa. 1795) (constructive levying of
war, based on forcible resistance to execution of a statute; defendants
convicted and later pardoned).  House tax case: *Case of Fries,* 9 Fed.
Cas. 826, 924, Nos. 5126, 5127 (C. C. D. Pa. 1799, 1800) (constructive
levying of war, based on forcible resistance to execution of a statute;
defendant convicted and later pardoned).  The Burr Conspiracy:
*Ex parte Bollman,* 4 Cranch 75 (1807), *United States* v. *Burr,* 25 Fed.
Cas. 2, 55, Nos. 14,692a, 14,693 (C. C. D. Va. 1807) (conspiracy to levy
war held not an overt act of levying war).  *United States* v. *Lee,* 26
Fed. Cas. 907, No. 15,584 (C. C. D. C. 1814) (sale of provisions a suffi-
cient overt act; acquittal).  *United States* v. *Hodges,* 26 Fed. Cas. 332,
No. 15,374 (C. C. D. Md. 1815) (obtaining release of prisoners to the
enemy is adhering to the enemy, the act showing the intent; acquittal).
*United States* v. *Hoxie,* 26 Fed. Cas. 397, No. 15,407 (C. C. D. Vt.
1808) (attack of smugglers on troops enforcing embargo is riot and
not levying of war).  *United States* v. *Pryor,* 27 Fed. Cas. 628, No.
16,096 (C. C. D. Pa. 1814) (proceeding under flag of truce with enemy
detachment to help buy provisions is too remote an act to establish
adhering to the enemy).  *United States* v. *Hanway,* 26 Fed. Cas. 105,
No. 15,299 (C. C. E. D. Pa. 1851) (forcible resistance to execution of
Fugitive Slave Law no levying of war).  *United States* v. *Greiner,* 26
Fed. Cas. 36, No. 15,262 (E. D. Pa. 1861) (participation as mem-
ber of state militia company in seizure of a federal fort is a levying
of war).  *United States* v. *Greathouse,* 26 Fed. Cas. 18, No. 15,254
(C. C. N. D. Cal. 1863) (fitting out and sailing a privateer is a levying
of war; defendants convicted, later pardoned).  Cases of confisca-
tion of property or refusal to enforce obligations given in connection
with sale of provisions to the Confederacy: *Hanauer* v. *Doane,* 12
Wall. 342 (1871); *Carlisle* v. *United States,* 16 Wall. 147 (1873);
*Sprott* v. *United States,* 20 Wall. 459 (1874); *United States* v. *Athens
Armory,* 24 Fed. Cas. 878, No. 14,473 (N. D. Ga. 1868) (mixed
motive, involving commercial profit, does not bar finding of giving aid
and comfort to the enemy).  *United States* v. *Cathcart* and *United*

and courts have sentenced, Presidents again and again have intervened to mitigate judicial severity or to pardon entirely. We have managed to do without treason prosecutions to a degree that probably would be impossible except while a people was singularly confident of external security and internal stability.[39]

*States* v. *Parmenter*, 25 Fed. Cas. 344, No. 14,756 (C. C. S. D. Ohio, 1864). *Chenoweth's Case* (unreported: see *Ex parte Vallandigham*, 28 Fed. Cas. 874, No. 16,816, at 888 (S. D. Ohio, 1863)) (indictment bad for alleging aiding and abetting rebels; instead of directly charging levying of war). *Case of Jefferson Davis*, 7 Fed. Cas. 63, No. 3621a (C. C. D. Va. 1867–71) (argument that rebels whose government achieved status of a recognized belligerent could not be held for treason; Davis was not tried on the indictment); see 2 Warren, Supreme Court in United States History (1934 ed.) 485–87; Watson, Trial of Jefferson Davis (1915) 25 Yale L. J. 669. Philippine insurrections: *United States* v. *Magtibay*, 2 Phil. 703 (1903), *United States* v. *De Los Reyes*, 3 Phil. 349 (1904) (mere possession of rebel commissions insufficient overt acts; strict enforcement of two-witness requirement; convictions reversed); *United States* v. *Lagnason*, 3 Phil. 472 (1904) (armed effort to overthrow the government is levying war). *United States* v. *Fricke*, 259 F. 673 (S. D. N. Y. 1919) (acts "indifferent" on their face held sufficient overt acts). *United States* v. *Robinson*, 259 F. 685 (S. D. N. Y. 1919) (dictum, acts harmless on their face are insufficient overt acts). *United States* v. *Werner*, 247 F. 708 (E. D. Pa. 1918), aff'd, 251 U. S. 466 (1919) (act indifferent on its face may be sufficient overt act). *United States* v. *Haupt*, 136 F. 2d 661 (C. C. A. 7th, 1943) (reversal of conviction on strict application of two-witness requirement and other grounds; inferentially approves acts harmless on their face as overt acts). *Stephan* v. *United States*, 133 F. 2d 87 (C. C. A. 6th, 1943) (acts harmless on their face may be sufficient overt acts; conviction affirmed but sentence commuted). *United States* v. *Cramer*, 137 F. 2d 888 (C. C. A. 2d, 1943).

[39] In 1942 the Office of War Information suggested to Mr. Stephen Vincent Benet a short interpretative history of the United States for translation into many languages. In it he says:

"It had been a real revolution—a long and difficult travail, full of hardship, struggle, bitterness, and the overturning of old habits and customs. But it did not eat its children and it had no aftermath of vengeance. The Hessians who stayed in the country were not hunted

### III

Historical materials aid interpretation chiefly in that they show two kinds of dangers against which the framers were concerned to guard the treason offense: (1) perversion by established authority to repress peaceful political opposition; and (2) conviction of the innocent as a result of perjury, passion, or inadequate evidence. The first danger could be diminished by closely circumscribing the kind of conduct which should be treason—making the constitutional definition exclusive, making it clear, and making the offense one not susceptible of being inferred from all sorts of insubordinations. The second danger lay in the manner of trial and was one which would be dimin-

---

down and annihilated. Some loyalists who returned were harshly treated—others came back and settled down peacefully as citizens of the new state. There was neither blood bath nor purge. There was bitter political dispute—but no small group of men plotted in secret to overthrow the government by force of arms. There were a couple of minor and local revolts, based on genuine grievances— Shays' Rebellion in 1786—the Whisky Rebellion in 1794. Both collapsed when the government showed itself able to put down rebellion— and nobody was hanged for either of them. Shays and his temporary rebels received a general amnesty—the leaders of the Whisky Rebellion were convicted of treason and then pardoned by the President." Benet, America, pp. 49–50.

Speaking of the War Between the States he says:

"Again, there was no blood purge. There were no mass executions. No heads rolled.

"The handful of fanatics who had plotted the assassination of Lincoln and other government leaders were executed. His actual murderer was tracked down and shot. The half-crazy officer who commanded a notorious southern prison camp was hanged. The former President of the Confederacy, Jefferson Davis, was kept for a while in prison with certain of his associates and then released. But that was all.

"Not one of the great southern generals or statesmen, Lee, Johnson, Stephens, Hampton, Longstreet—was even tried for treason." *Id.*, 78.

ished mainly by procedural requirements—mainly but not wholly, for the hazards of trial also would be diminished by confining the treason offense to kinds of conduct susceptible of reasonably sure proof. The concern uppermost in the framers' minds, that mere mental attitudes or expressions should not be treason, influenced both definition of the crime and procedure for its trial. In the proposed Constitution the first sentence of the treason article undertook to define the offense; the second, to surround its trial with procedural safeguards.

"Compassing" and like loose concepts of the substance of the offense had been useful tools for tyranny. So one of the obvious things to be put into the definition of treason not consisting of actual levying of war was that it must consist of doing something. This the draft Constitution failed to provide, for, as we have pointed out, it defined treason [40] as merely "adhering to the enemies of the United States, or any of them."

Treason of adherence to an enemy was old in the law. It consisted of breaking allegiance to one's own king by forming an attachment to his enemy. Its scope was comprehensive, its requirements indeterminate. It might be predicated on intellectual or emotional sympathy with the foe, or merely lack of zeal in the cause of one's own country. That was not the kind of disloyalty the framers thought should constitute treason. They promptly accepted the proposal to restrict it to cases where also there was conduct which was "giving them aid and comfort."

"Aid and comfort" was defined by Lord Reading in the Casement trial comprehensively, as it should be, and yet probably with as much precision as the nature of the matter will permit: ". . . an act which strengthens or tends to strengthen the enemies of the King in the conduct of a

---

[40] Apart, of course, from levying war, which is not charged in this case and is not involved in the controversy.

war against the King, that is in law the giving of aid and comfort" and "an act which weakens or tends to weaken the power of the King and of the country to resist or to attack the enemies of the King and the country . . . is . . . giving of aid and comfort." Lord Reading explained it, as we think one must, in terms of an "act." It is not easy, if indeed possible, to think of a way in which "aid and comfort" can be "given" to an enemy except by some kind of action. Its very nature partakes of a deed or physical activity as opposed to a mental operation.

Thus the crime of treason consists of two elements: adherence to the enemy; and rendering him aid and comfort. A citizen intellectually or emotionally may favor the enemy and harbor sympathies or convictions disloyal to this country's policy or interest, but so long as he commits no act of aid and comfort to the enemy, there is no treason. On the other hand, a citizen may take actions which do aid and comfort the enemy—making a speech critical of the government or opposing its measures, profiteering, striking in defense plants or essential work, and the hundred other things which impair our cohesion and diminish our strength—but if there is no adherence to the enemy in this, if there is no intent to betray, there is no treason.

Having thus by definition made treason consist of something outward and visible and capable of direct proof, the framers turned to safeguarding procedures of trial and ordained that "No Person shall be convicted of Treason unless on the Testimony of two Witnesses to the same overt Act, or on Confession in open Court." This repeats in procedural terms the concept that thoughts and attitudes alone cannot make a treason. It need not trouble us that we find so dominant a purpose emphasized in two different ways. But does the procedural requirement add some limitation not already present in the definition of the crime, and if so, what?

30

While to prove giving of aid and comfort would require the prosecution to show actions and deeds, if the Constitution stopped there, such acts could be inferred from circumstantial evidence. This the framers thought would not do.[41] So they added what in effect is a command that the overt acts must be established by direct evidence, and the direct testimony must be that of two witnesses instead of one. In this sense the overt act procedural provision adds something, and something important, to the definition.

Our problem begins where the Constitution ends. That instrument omits to specify what relation the indispensable overt act must sustain to the two elements of the offense as defined: viz., adherence and giving aid and comfort. It requires that two witnesses testify to the same overt act, and clearly enough the act must show something toward treason, but what? Must the act be one of giving aid and comfort? If so, how must adherence to the enemy, the disloyal state of mind, be shown?

The defendant especially challenges the sufficiency of

---

[41] Hallam in his *Constitutional History of England* (1827) said: "Nothing had brought so much disgrace on the councils of government, and on the administration of justice, nothing more forcibly spoken the necessity of a great change, than the prosecutions for treason during the latter years of Charles II, and in truth during the whole course of our legal history. The statutes of Edward III and Edward VI, almost set aside by sophistical constructions, required the corroboration of some more explicit law; and some peculiar securities were demanded for innocence against that conspiracy of the court with the prosecutor, which is so much to be dreaded in all trials for political crimes." v. 2, p. 509.

Continuing, after comment on particular cases, he said: "In the vast mass of circumstantial testimony which our modern trials for high treason display, it is sometimes difficult to discern, whether the great principle of our law, requiring two witnesses to overt acts, has been adhered to; for certainly it is not adhered to, unless such witnesses depose to acts of the prisoner, from which an inference of his guilt is immediately deducible." v. 2, p. 516.

the overt acts to prove treasonable intention. Questions of intent in a treason case are even more complicated than in most criminal cases because of the peculiarity of the two different elements which together make the offense. Of course the overt acts of aid and comfort must be intentional as distinguished from merely negligent or undesigned ones. Intent in that limited sense is not in issue here. But to make treason the defendant not only must intend the act, but he must intend to betray his country by means of the act. It is here that Cramer defends. The issue is joined between conflicting theories as to how this treacherous intention and treasonable purpose must be made to appear.

Bearing in mind that the constitutional requirement in effect is one of direct rather than circumstantial evidence, we must give it a reasonable effect in the light of its purpose both to preserve the offense and to protect citizens from its abuse. What is designed in the mind of an accused never is susceptible of proof by direct testimony. If we were to hold that the disloyal and treacherous intention must be proved by the direct testimony of two witnesses, it would be to hold that it is never provable. It seems obvious that adherence to the enemy, in the sense of a disloyal state of mind, cannot be, and is not required to be, proved by deposition of two witnesses.

Since intent must be inferred from conduct of some sort, we think it is permissible to draw usual reasonable inferences as to intent from the overt acts. The law of treason, like the law of lesser crimes, assumes every man to intend the natural consequences which one standing in his circumstances and possessing his knowledge would reasonably expect to result from his acts. Proof that a citizen did give aid and comfort to an enemy may well be in the circumstances sufficient evidence that he adhered to that enemy and intended and purposed to strike at his

own country.[42]   It may be doubted whether it would be what the founders intended, or whether it would well serve any of the ends they cherished, to hold the treason offense available to punish only those who make their treacherous intentions more evident than may be done by rendering aid and comfort to an enemy.   Treason—insidious and dangerous treason—is the work of the shrewd and crafty more often than of the simple and impulsive.

While of course it must be proved that the accused acted with an intention and purpose to betray or there is no treason, we think that in some circumstances at least the overt act itself will be evidence of the treasonable purpose and intent. `But that still leaves us with exceedingly difficult problems.   How decisively must treacherous intention be made manifest in the act itself?   Will a scintilla of evidence of traitorous intent suffice?   Or must it be sufficient to convince beyond reasonable doubt?   Or need it show only that treasonable intent was more probable than not?   Must the overt act be appraised for legal sufficiency only as supported by the testimony of two witnesses, or may other evidence be thrown into the scales to create inferences not otherwise reasonably to be drawn or to reinforce those which might be drawn from the act itself?

It is only overt acts by the accused which the Constitution explicitly requires to be proved by the testimony of two witnesses.   It does not make other common-law evidence inadmissible nor deny its inherent powers of persuasion.   It does not forbid judging by the usual process by which the significance of conduct often will be determined by facts which are not acts.   Actions of the accused are set

---

[42] There are, of course, rare cases where adherence might be proved by an overt act such as subscribing an oath of allegiance or accepting pay from an enemy.   These might supplement proof of other acts of aid and comfort, but no such overt acts of adherence are involved in this case.

in time and place in many relationships. Environment illuminates the meaning of acts, as context does that of words. What a man is up to may be clear from considering his bare acts by themselves; often it is made clear when we know the reciprocity and sequence of his acts with those of others, the interchange between him and another, the give and take of the situation.

It would be no contribution to certainty of judgment, which is the object of the provision, to construe it to deprive a trial court of the aid of testimony under the ordinary sanctions of verity, provided, of course, resort is not had to evidence of less than the constitutional standard to supply deficiencies in the constitutional measure of proof of overt acts. For it must be remembered that the constitutional provision establishes a minimum of proof of incriminating acts, without which there can be no conviction, but it is not otherwise a limitation on the evidence with which a jury may be persuaded that it ought to convict. The Constitution does not exclude or set up standards to test evidence which will show the relevant acts of persons other than the accused or their identity or enemy character or other surrounding circumstances. Nor does it preclude any proper evidence of non-incriminating facts about a defendant, such for example as his nationality, naturalization, and residence.

From duly proven overt acts of aid and comfort to the enemy in their setting, it may well be that the natural and reasonable inference of intention to betray will be warranted. The two-witness evidence of the acts accused, together with common-law evidence of acts of others and of facts which are not acts, will help to determine which among possible inferences as to the actor's knowledge, motivation, or intent are the true ones. But the protection of the two-witness rule extends at least to all acts of the defendant which are used to draw incriminating inferences that aid and comfort have been given.

34

The controversy before us has been waged in terms of intentions, but this, we think, is the reflection of a more fundamental issue as to what is the real function of the overt act in convicting of treason. The prisoner's contention that it alone and on its face must manifest a traitorous intention, apart from an intention to do the act itself, would place on the overt act the whole burden of establishing a complete treason. On the other hand, the Government's contention that it may prove by two witnesses an apparently commonplace and insignificant act and from other circumstances create an inference that the act was a step in treason and was done with treasonable intent really is a contention that the function of the overt act in a treason prosecution is almost zero. It is obvious that the function we ascribe to the overt act is significant chiefly because it measures the two-witness rule protection to the accused and its handicap to the prosecution. If the overt act or acts must go all the way to make out the complete treason, the defendant is protected at all points by the two-witness requirement. If the act may be an insignificant one, then the constitutional safeguards are shrunken so as to be applicable only at a point where they are least needed.

The very minimum function that an overt act [43] must perform in a treason prosecution is that it show sufficient action by the accused, in its setting, to sustain a finding that the accused actually gave [44] aid and comfort to the enemy. Every act, movement, deed, and word of the defendant charged to constitute treason must be supported

---

[43] Of course, the Constitution does not require a treason to be proved by any single overt act. It may be grounded upon any number, each to be supported by the testimony of two witnesses. We speak in the singular but what we say applies as well to a series of acts or to the sum of many acts.

[44] We are not concerned here with any question as to whether there may be an offense of attempted treason.

by the testimony of two witnesses. The two-witness principle is to interdict imputation of *incriminating acts* to the accused by circumstantial evidence or by the testimony of a single witness. The prosecution cannot rely on evidence which does not meet the constitutional test for overt acts to create any inference that the accused did other acts or did something more than was shown in the overt act, in order to make a giving of aid and comfort to the enemy. The words of the Constitution were chosen, not to make it hard to prove merely routine and everyday acts, but to make the proof of acts that convict of treason as sure as trial processes may. When the prosecution's case is thus established, the Constitution does not prevent presentation of corroborative or cumulative evidence of any admissible character either to strengthen a direct case or to rebut the testimony or inferences on behalf of defendant. The Government is not prevented from making a strong case; it is denied a conviction on a weak one.

It may be that in some cases the overt acts, sufficient to prove giving of aid and comfort, will fall short of showing intent to betray and that questions will then be raised as to permissible methods of proof that we do not reach in this case. But in this and some cases we have cited where the sufficiency of the overt acts has been challenged because they were colorless as to intent, we are persuaded the reason intent was left in question was that the acts were really indecisive as a giving of aid and comfort. When we deal with acts that are trivial and commonplace and hence are doubtful as to whether they gave aid and comfort to the enemy, we are most put to it to find in other evidence a treacherous intent.

We proceed to consider the application of these principles to Cramer's case.

IV

The indictment charged Cramer with adhering to the enemies of the United States, giving them aid and com-

fort, and set forth ten overt acts. The prosecution withdrew seven, and three were submitted to the jury. The overt acts which present the principal issue [45] are alleged in the following language:

"1. Anthony Cramer, the defendant herein, on or about June 23, 1942, at the Southern District of New York and within the jurisdiction of this Court, did meet with Werner Thiel and Edward John Kerling, enemies of the United States, at the Twin Oaks Inn at Lexington Avenue and 44th Street, in the City and State of New York, and did confer, treat, and counsel with said Werner Thiel and Edward John Kerling for a period of time for the purpose of giving and with intent to give aid and comfort to said enemies, Werner Thiel and Edward John Kerling.

"2. Anthony Cramer, the defendant herein, on or about June 23, 1942, at the Southern District of New York and

---

[45] The verdict in this case was a general one of guilty, without special findings as to the acts on which it rests. Since it is not possible to identify the grounds on which Cramer was convicted, the verdict must be set aside if any of the separable acts submitted was insufficient. *Stromberg* v. *California*, 283 U. S. 359, 368; *Williams* v. *North Carolina*, 317 U. S. 287, 292. The tenth act charged, the third submitted, was based on five falsehoods told by Cramer after his arrest to agents of the Federal Bureau of Investigation, admittedly for the purpose of shielding Werner Thiel. After some time he recanted the falsehoods and told the truth. Thiel had already been taken into custody when the interviews occurred. The prisoner contends that lying to his jailer does not constitute treason, that in the whole history of treason no precedent can be or is cited for holding a false statement while under interrogation after imprisonment is treason, that in any event it amounted to no more than an attempt which was not consummated, that there was no right to interrogate Cramer under the circumstances, and that admissions made out of court are rendered inadmissible as proof of overt acts in view of the requirement that the act be proved by two witnesses or by "confession in open court." The use of this evidence as an overt act of treason is complicated, and we intimate no views upon it in view of reversal on other grounds. Were we to affirm we should have first to resolve these questions against the prisoner.

within the jurisdiction of this Court, did accompany, confer, treat, and counsel with Werner Thiel, an enemy of the United States, for a period of time at the Twin Oaks Inn at Lexington Avenue and 44th Street, and at Thompson's Cafeteria on 42nd Street between Lexington and Vanderbilt Avenues, both in the City and State of New York, for the purpose of giving and with intent to give aid and comfort to said enemy, Werner Thiel."

At the present stage of the case we need not weigh their sufficiency as a matter of pleading. Whatever the averments might have permitted the Government to prove, we now consider their adequacy on the proof as made.

It appeared upon the trial that at all times involved in these acts Kerling and Thiel were under surveillance of the Federal Bureau of Investigation. By direct testimony of two or more agents it was established that Cramer met Thiel and Kerling on the occasions and at the places charged and that they drank together and engaged long and earnestly in conversation. This is the sum of the overt acts as established by the testimony of two witnesses. There is no two-witness proof of what they said nor in what language they conversed. There is no showing that Cramer gave them any information whatever of value to their mission or indeed that he had any to give. No effort at secrecy is shown, for they met in public places. Cramer furnished them no shelter, nothing that can be called sustenance or supplies, and there is no evidence that he gave them encouragement or counsel, or even paid for their drinks.

The Goverment recognizes the weakness of its proof of aid and comfort, but on this score it urges: "Little imagination is required to perceive the advantage such meeting would afford to enemy spies not yet detected. Even apart from the psychological comfort which the meetings furnished Thiel and Kerling by way of social intercourse with

one who they were confident would not report them to the authorities, as a loyal citizen should, the meetings gave them a source of information and an avenue for contact. It enabled them to be seen in public with a citizen above suspicion and thereby to be mingling normally with the citizens of the country with which they were at war." The difficulty with this argument is that the whole purpose of the constitutional provision is to make sure that treason conviction shall rest on direct proof of two witnesses and not on even a little imagination. And without the use of some imagination it is difficult to perceive any advantage which this meeting afforded to Thiel and Kerling as enemies or how it strengthened Germany or weakened the United States in any way whatever. It may be true that the saboteurs were cultivating Cramer as a potential "source of information and an avenue for contact." But there is no proof either by two witnesses or by even one witness or by any circumstance that Cramer gave them information or established any "contact" for them with any person other than an attempt to bring about a rendezvous between Thiel and a girl, or that being "seen in public with a citizen above suspicion" was of any assistance to the enemy. Meeting with Cramer in public drinking places to tipple and trifle was no part of the saboteurs' mission and did not advance it. It may well have been a digression which jeopardized its success.

The shortcomings of the overt act submitted are emphasized by contrast with others which the indictment charged but which the prosecution withdrew for admitted insufficiency of proof. It appears that Cramer took from Thiel for safekeeping a money belt containing about $3,600, some $160 of which he held in his room concealed in books for Thiel's use as needed. An old indebtedness of Thiel to Cramer of $200 was paid from the fund, and the rest Cramer put in his safe-deposit box in a bank for safekeeping. All of this was at Thiel's request. That Thiel

would be aided by having the security of a safe-deposit box for his funds, plus availability of smaller amounts, and by being relieved of the risks of carrying large sums on his person—without disclosing his presence or identity to a bank—seems obvious. The inference of intent from such act is also very different from the intent manifest by drinking and talking together. Taking what must have seemed a large sum of money for safekeeping is not a usual amenity of social intercourse. That such responsibilities are undertaken and such trust bestowed without the scratch of a pen to show it, implies some degree of mutuality and concert from which a jury could say that aid and comfort was given and was intended. If these acts had been submitted as overt acts of treason, and we were now required to decide whether they had been established as required, we would have a quite different case. We would then have to decide whether statements on the witness stand by the defendant are either "confession in open court" or may be counted as the testimony of one of the required two witnesses to make out otherwise insufficiently proved "overt acts." But this transaction was not proven as the Government evidently hoped to do when the indictment was obtained. The overt acts based on it were expressly withdrawn from the jury, and Cramer has not been convicted of treason on account of such acts. We cannot sustain a conviction for the acts submitted on the theory that, even if insufficient, some unsubmitted ones may be resorted to as proof of treason. Evidence of the money transaction serves only to show how much went out of the case when it was withdrawn.

The Government contends that outside of the overt acts, and by lesser degree of proof, it has shown a treasonable intent on Cramer's part in meeting and talking with Thiel and Kerling. But if it showed him disposed to betray, and showed that he had opportunity to do so, it still has not proved in the manner required that he did any acts

submitted to the jury as a basis for conviction which had the effect of betraying by giving aid and comfort. To take the intent for the deed would carry us back to constructive treasons.

It is outside of the commonplace overt acts as proved that we must find all that convicts or convinces either that Cramer gave aid and comfort or that he had a traitorous intention. The prosecution relied chiefly upon the testimony of Norma Kopp, the fiancée of Thiel, as to incriminating statements made by Cramer to her,[46] upon admissions made by Cramer after his arrest to agents of the Federal Bureau of Investigation,[47] upon letters and

---

[46] The testimony of Norma Kopp was probably the most damaging to the prisoner. She was a German alien who had been in the United States since 1928, but had never become a citizen. She had long and intimately known both Cramer and Thiel and became engaged to marry Thiel four days before he left for Germany. She knew him to be a Nazi. She received at Westport, Conn., where she was working as a laundry and kitchen maid, a note from Cramer, asking her to come to New York for an undisclosed reason. She came and Cramer then, she says, told her that Thiel was back, that he came with others, that six of them landed from a submarine in a rubber boat in Florida, that they brought much money "from Germany from the German Government," that Cramer was keeping it for Thiel in his safety deposit box, that these men got instructions from a "sitz" in the Bronx as to where to go, but Cramer said he did not know what he meant by "sitz." Cramer said he expected Thiel that evening at his apartment, but Thiel did not come. Cramer failed to bring about her meeting with Thiel, as he had promised her. She was at Kolping House when Cramer was taken into custody. The following day pictures of the saboteurs and the story of their landing and arrest was in the newspapers. She was taken into custody and questioned by the Federal Bureau of Investigation.

[47] Cramer left a note for "William Thomas," the name under which Thiel was going, at the Commodore Hotel, where he was staying, saying that Miss Kopp had come and asking Thiel to meet them at Thompson's Cafeteria at 4:00 that afternoon or call them at 7:00 that evening at Kolping House. Thiel had been arrested and did not keep the

documents found on search of his room by permission after his arrest,[48] and upon testimony that Cramer had

rendezvous nor make the call. About 10:50 p. m. June 27, Cramer was taken into custody at Kolping House and taken to the Bureau's headquarters in New York. He told the agents that the man he had been with at Thompson's Cafeteria was William Thomas, that Thomas had worked in a factory on the West Coast since March of 1941 and had not been out of the United States. When asked if the true name of William Thomas was not Werner Thiel, he replied that it was, and that Thiel was using an assumed name because of difficulties with his draft board. He stated that the money belt which Thiel had given him contained only $200, which Thiel owed him, and that the $3,500 in the safety deposit box belonged to him and had been obtained from the sale of securities. The gravity of the offense with which he might be confronted was intimated to Cramer, and he asked if he might speak with agent Ostholthoff alone. To him he recanted his previous false statements and admitted that he knew Thiel had come from Germany, probably on a mission for the German Government, which he thought was "to stir up unrest among the people and probably spread propaganda." He repeated this in the presence of other agents and stated that he had lied in order to protect Thiel. Cramer authorized the agents to search his room and to open his safe-deposit box at the Corn Exchange Bank and remove the contents thereof.

[48] As summarized in the opinion of the Circuit Court of Appeals, these are: "Writing Thiel in Germany, November 25, 1941, appellant said that 'defiance, boldness, will, and sharp weapons will decide the war, and the Germany Army and the German people are not lacking in these,' that he was 'very discontent' and sat here 'in pitiable comfort,' and that he had refused a job in Detroit at $100 per week because 'I do not want to soil my hands with war work.' To his family in Germany he wrote December 3, 1941, of 'the gigantic sacrifices which the glorious, disciplined German Army is making from day to day for the Homeland,' that 'every day here I hear the shrieks of hatred and the clamor for annihilation from the hostile foreigners,' and that a lost war 'means today a complete extirpation of the German nation.' To a friend in Chicago he wrote April 21, 1942, objecting to conscription 'after one has spent almost half a lifetime here in the States,' and saying 'personally I should not care at all to be misused by the American army as a world conqueror.' All the letters were written in German."

**42**

curtly refused to buy Government bonds.[49]  After denial of defendant's motion to dismiss at the close of the prosecution's case, defendant became a witness in his own behalf and the Government obtained on cross-examination some admissions of which it had the benefit on submission.[50]

[49] On the Government's case a witness testified that he went to Cramer's apartment, told him that he was a representative of the United States Government on a pledge drive and asked him if he would like to sign a pledge for a bond.  Cramer said he was not interested and, in reply to the question whether he would sign up for a stamp, he said he was not even interested in the purchase of a 10-cent stamp.  He then closed the door.  The witness rang again and Cramer opened the door again and then closed it.

Norma Kopp testified that Cramer told her that the "Minute Man" called at his door "and he got kind of fresh and he closed the door at him."  Miss Kopp's testimony was objected to and was offered as "showing the general motive and disposition, in so far as loyalty to the country is concerned, of this defendant," and as probative on the issue of intent.  The court received it on the theory that incidents of that sort might corroborate or the jury might find it corroborated certain other testimony offered by the Government indicating a motive or intent.

[50] The defendant, having testified in his own behalf, was under cross-examination.  He was asked: "Q. Now, sir, isn't it the fact that you did write to Germany in the year 1941 several letters in which you discussed the United States in an unfriendly manner?  A. I do not know unfriendly.  I would say that I have criticized a few persons.  I have never criticized the United States as such."  He was then asked whether in 1941 he did not receive letters from his nephew Norbert and whether it was not the fact that Cramer's brother, Norbert's father, "through Norbert warned you that your letters discussed the United States in such an unfriendly fashion that Norbert's father feared that you would be put on the blacklist, because according to him the letters went through an American censorship?"  Objection was duly made that the letters referred to were from someone else and could not bind the defendant.  The objection was overruled, and the witness answered: "Well, I have received a letter from my nephew Norbert which mentions that, I admit that."  A motion to

It is not relevant to our issue to appraise weight or credibility of the evidence apart from determining its constitutional sufficiency. Nor is it necessary, in the view we take of the more fundamental issues, to discuss the

strike the answer was denied, and exceptions to both rulings were duly taken.

The Circuit Court of Appeals observed that, "Of course, these expressions of opinion could not properly bind appellant; and the objection might wisely have been sustained." But it concluded that the ruling was not sufficiently prejudicial to call for reversal.

While defendant was under cross-examination, he was asked, "By the way, Mr. Witness, you have testified at length here about your various studies and your various occupations and interests. Were you ever interested in law? A. No, sir; I was not. Q. Isn't it a fact, sir, that at one time you were particularly interested in the law of treason? A. No, sir; I have never been interested in that." The District Attorney then offered a complete text of the Constitution of the United States as printed in the New York Times in 1937. It had been found in Cramer's room and on it were marks which he admitted making. One of the marks was opposite the paragraph which defines treason. The District Attorney offered it for impeachment and also contended it to be of probative force to show "that this witness had in mind at the time these events which are the subject of the indictment here occurred, what the law of treason was." Against objection the court admitted it as material and relevant and declined to limit the grounds on which it was received.

It appears without dispute that the marks on this copy of the Constitution were made at a time not definitely established but clearly before the United States entered the war and when the policy of the Government was declared to be one of neutrality.

The treason paragraph of the Constitution was one of six provisions which he marked. Another was the provision of Article 1 of § 7, that if any bill passed by the Congress shall not be returned by the President within ten days after having been presented to him, the same shall be a law. Another, the provision of Article 1, § 8, that Congress shall have the power to declare war, grant letters of marque and reprisal and make rules concerning captures on land and water. A third was Article 1, § 9, which provides that no bill of attainder or ex post facto law shall be passed. A fourth was that pro-

reservations which all of us entertain as to the admissibility of some of it or those which some entertain as to other of it. We could conclude in favor of affirmance only if all questions of admissibility were resolved against the prisoner. At all events much of the evidence is of the general character whose infirmities were feared by the framers and sought to be safeguarded against.

Most damaging is the testimony of Norma Kopp, a friend of Cramer's and one with whom, if she is to be believed, he had been most indiscreetly confidential. Her testimony went considerably beyond that of the agents of the Federal Bureau of Investigation as to admissions of guilty knowledge of Thiel's hostile mission and of Cramer's sympathy with it. To the extent that his conviction rests upon such evidence, and it does to an unknown but considerable extent, it rests upon the uncorroborated testimony of one witness not without strong emotional interest in the drama of which Cramer's trial was a part. Other evidence relates statements by Cramer before the United States was at war with Germany. At the time they were uttered, however, they were not treasonable. To use pre-war expressions of opposition to entering a war to convict of treason during the war is a dangerous procedure at best. The same may be said about the inference of disloyal attitude created by showing that he refused to buy bonds and closed the door in the salesman's face. Another class of evidence consists of admissions to agents of the Federal Bureau of Investigation. They are, of course, not "confessions in open court." The Government does not contend and could not well contend

vision of Article 1, § 9, that no title of nobility shall be granted by the United States. Another was the portion of Article 2, § 1, which sets forth the President's oath.

The petitioner was naturalized in 1936 and, so far as appears, came into possession of the Constitution in 1937.

that admissions made out of court, if otherwise admissible, can supply a deficiency in proof of the overt act itself.

## V

The Government has urged that our initial interpretation of the treason clause should be less exacting, lest treason be too hard to prove and the Government disabled from adequately combating the techniques of modern warfare. But the treason offense is not the only nor can it well serve as the principal legal weapon to vindicate our national cohesion and security. In debating this provision, Rufus King observed to the Convention that the "controversy relating to Treason might be of less magnitude than was supposed; as the legislature might punish capitally under other names than Treason." [51] His statement holds good today. Of course we do not intimate that Congress could dispense with the two-witness rule merely by giving the same offense another name. But the power of Congress is in no way limited to enact prohibitions of specified acts thought detrimental to our wartime safety. The loyal and the disloyal alike may be forbidden to do acts which place our security in peril, and the trial thereof may be focussed upon defendant's specific intent to do those particular acts [52] thus eliminating the accusation of treachery and of general intent to betray which have such passion-rousing potentialities. Congress repeatedly has enacted prohibitions of specific acts thought to endanger our security [53] and the practice of foreign nations with de-

---

[51] 2 Farrand 347.

[52] E. g., *Hartzel* v. *United States*, 322 U. S. 680.

[53] Congress has prohibited obtaining defense information in certain ways, 50 U. S. C. § 31; certain disclosures of information, 50 U. S. C. § 32; certain seditious and disloyal acts in wartime, 50 U. S. C. § 33; and has enacted such statutes as the Trading with the Enemy Act, 50 U. S. C. App. § 3.

fense problems more acute than our own affords examples of others.[54]

The framers' effort to compress into two sentences the law of one of the most intricate of crimes gives a superficial appearance of clarity and simplicity which proves illusory when it is put to practical application. There are few subjects on which the temptation to utter abstract

---

[54] The Government's Appendix includes such examples as the following:

*Danish Penal Code.*—"Sec. 105. One who commits an act by virtue of which a foreign service of military intelligence is set up, or who assists directly or indirectly in its functioning on the territory of the State of Denmark, shall be punished by imprisonment up to two years and in cases of extenuating circumstances by detention."

*Polish Code.*—"Art. 100. Sec. 1. Whoever in time of war acts in favor of the enemy or to the damage of the Polish armed forces or allied forces shall be punished by imprisonment not under ten years or for life.

"Art. 100. Sec. 2. If the offender unintentionally acted, he shall be punished by imprisonment not to exceed three years or by detention not to exceed three years."

*French Code of 1939.*—"Art. 103. Whoever, knowing about the plans of an act of treason or espionage, does not report them to the military, administrative, or judicial authorities as soon as he acquired knowledge shall be punished by penalties provided by Art. 83 for the attack on the exterior safety of the State."

The French Code (Harboring) provides in Article 85 that every Frenchman and every foreigner shall be punished as an accomplice or for harboring:

"(1) Who, knowing the intentions of the perpetrators of major crimes and minor crimes against the exterior safety of the State, furnishes them subsidies, means of existence, lodging, place of asylum or meeting place.

"(2) Who, knowingly carries the correspondence of the perpetrators of a major or minor crime or knowingly facilitates them in any manner whatsoever in finding, harboring, transporting, or transmitting, the objects of a major or minor crime;

"(3) Who harbors knowingly the objects or instruments which served or should serve for the commission of the crime or offense or material objects or documents obtained through a crime or offense."

interpretative generalizations is greater or on which they are more to be distrusted. The little clause is packed with controversy and difficulty. The offense is one of subtlety, and it is easy to demonstrate lack of logic in almost any interpretation by hypothetical cases, to which real treasons rarely will conform. The protection of the two-witness requirement, limited as it is to overt acts, may be wholly unrelated to the real controversial factors in a case. We would be understood as speaking only in the light of the facts and of the issues raised in the case under consideration, although that leaves many undetermined grounds of dispute which, after the method of the common law, we may defer until they are presented by facts which may throw greater light on their significance. Although nothing in the conduct of Cramer's trial evokes it, a repetition of Chief Justice Marshall's warning can never be untimely:

"As there is no crime which can more excite and agitate the passions of men than treason, no charge demands more from the tribunal before which it is made, a deliberate and temperate inquiry. Whether this inquiry be directed to the fact or to the law, none can be more solemn, none more important to the citizen or to the government; none can more affect the safety of both.

". . . It is, therefore, more safe, as well as more consonant to the principles of our constitution, that the crime of treason should not be extended by construction to doubtful cases; and that crimes not clearly within the constitutional definition, should receive such punishment as the legislature in its wisdom may provide." *Ex parte Bollman,* 4 Cranch 75, 125, 127.

It is not difficult to find grounds upon which to quarrel with this constitutional provision. Perhaps the framers placed rather more reliance on direct testimony than modern researches in psychology warrant. Or it may be considered that such a quantitative measure of proof, such

48

a mechanical calibration of evidence is a crude device at best or that its protection of innocence is too fortuitous to warrant so unselective an obstacle to conviction. Certainly the treason rule, whether wisely or not, is severely restrictive. It must be remembered, however, that the Constitutional Convention was warned by James Wilson that "Treason may sometimes be practiced in such a manner, as to render proof extremely difficult—as in a traitorous correspondence with an Enemy." [55] The provision was adopted not merely in spite of the difficulties it put in the way of prosecution but because of them. And it was not by whim or by accident, but because one of the most venerated of that venerated group considered that "prosecutions for treason were generally virulent." Time has not made the accusation of treachery less poisonous, nor the task of judging one charged with betraying the country, including his triers, less susceptible to the influence of suspicion and rancor. The innovations made by the forefathers in the law of treason were conceived in a faith such as Paine put in the maxim that "He that would make his own liberty secure must guard even his enemy from oppression; for if he violates this duty he establishes a precedent that will reach himself." [56] We still put trust in it.

We hold that overt acts 1 and 2 are insufficient as proved to support the judgment of conviction, which accordingly is

*Reversed.*

Mr. Justice Douglas, with whom the Chief Justice, Mr. Justice Black and Mr. Justice Reed concur, dissenting.

The opinion of the Court is written on a hypothetical state of facts, not on the facts presented by the record.

---

[55] 2 Farrand 348.

[56] See Brooks, The World of Washington Irving, 73 n.

It states a rule of law based on an interpretation of the Constitution which is not only untenable but is also unnecessary for the decision. It disregards facts essential to a determination of the question presented for decision. It overlooks the basic issue on which our disposition of the case must turn. In order to reach that issue we must have a more exact appreciation of the facts than can be gleaned from the opinion of the Court.

I

Cramer is a naturalized citizen of the United States, born in Germany. He served in the German army in the last war, coming to this country in 1925. In 1929 he met Thiel who had come to this country in 1927 from a place in Germany not far from petitioner's birthplace. The two became close friends; they were intimate associates during a twelve-year period. In 1933 Cramer found work in Indiana. Thiel joined him there. Both became members of the Friends of New Germany, predecessor of the German-American Bund. Cramer was an officer of the Indiana local. He resigned in 1935 but Thiel remained a member and was known as a zealous Nazi. In 1936 Cramer visited Germany. On his return he received his final citizenship papers. He and Thiel returned to New York in 1937 and lived either together or in close proximity for about four years. Thiel left for Germany in the spring of 1941, feeling that war between the United States and Germany was imminent. According to Cramer, Thiel was "up to his ears" in Nazi ideology. Cramer corresponded with Thiel in Germany. Prior to our declaration of war, he was sympathetic with the German cause and critical of our attitude. Thus in November, 1941, he wrote Thiel saying he had declined a job in Detroit, "as I don't want to dirty my fingers with war material"; that "We sit here in pitiable comfort, when we should be in the

battle—as Nietzsche says—I want the man, I want the woman, the one fit for war, the other fit for bearing." In the spring of 1942 he wrote another friend in reference to the possibility of being drafted: "Personally I should not care at all to be misused by the American army as a world conqueror." Cramer listened to short-wave broadcasts of Lord Haw-Haw and other German propagandists. He knew that the theme of German propaganda was that England and the United States were fighting a war of aggression and seeking to conquer the world.

So much for the background. What followed is a sequel to *Ex parte Quirin*, 317 U. S. 1.

Thiel entered the German army and in 1942 volunteered with seven other German soldiers who had lived in the United States for a special mission to destroy the American aluminum industry. They were brought here by German submarines in two groups. Kerling was the leader and Thiel a member of one group which landed by rubber boat near Jacksonville, Florida on June 17, 1942. They buried their explosives and proceeded to New York City, where on June 21st they registered at the Hotel Commodore under the assumed names of Edward Kelly and William Thomas.

The next morning a strange voice called Cramer's name from the hall of the rooming house where he lived. On his failure to reply an unsigned note was slipped under his door. It read, "Be at the Grand Central station tonight at 8 o'clock, the upper platform near the information booth, Franz from Chicago has come into town and wants to see you; don't fail to be there." Cramer said he knew no Franz from Chicago. But nevertheless he was on hand at the appointed hour and place. Thiel shortly appeared. They went to the Twin Oaks Inn where they talked for two hours. Cramer admitted that he knew Thiel had come from Germany; and of course, he knew that at that time men were not freely entering this country from Ger-

many. He asked Thiel, "Say, how have you come over, have you come by submarine?" Thiel looked startled, smiled, and said, "Some other time I am going to tell you all about this." Thiel told him that he had taken the assumed name of William Thomas and had a forged draft card. Thiel admonished him to remember that he, Thiel, was "anti-Nazi"—a statement Cramer doubted because he knew Thiel was a member of the Nazi party. Thiel indicated he had come from the coast of Florida. Cramer inquired if he had used a rubber boat. When Thiel said that the only time he was "scared to death was when I came over here we got bombed," Cramer replied, "Then you have come over by submarine, haven't you?" Thiel told Cramer that he had "three and a half or four thousand dollars" with him and that "if you have the right kind of connection you can even get dollars in Germany." Cramer offered to keep Thiel's money for him. Thiel agreed but nothing was done about it that evening. Cramer admitted he had a "hunch" that Thiel was here on a mission for the German government. He asked Thiel "whether he had come over here to spread rumors and incite unrest." Cramer after his arrest told agents of the F. B. I. that he had suspected that Thiel had received the money from the German government, that Thiel in fact had told him that he was on a mission for Germany, and that "whatever his mission was, I thought that he was serious in his undertaking." Thiel from the beginning clothed his actions with secrecy; was unwilling to be seen at Cramer's room ("because I have too many acquaintances there and I don't want them to see me"); and cautioned Cramer against conversing loudly with him in the public tavern.

So they agreed to meet at the Twin Oaks Inn at 8 P. M. on the following evening, June 23, 1942. At this meeting Kerling joined them. Cramer had met Kerling in this country and knew he had returned to Germany. Kerling

and Thiel told Cramer that they had come over together. Cramer had a "hunch" that Kerling was here for the same purpose as Thiel. Kerling left Thiel and Cramer after about an hour and a half. Kerling was followed and arrested. Cramer and Thiel stayed on at the tavern for about another hour. After Kerling left, Thiel agreed to entrust his money to Cramer for safekeeping. He told Cramer to take out $200 which Thiel owed him. But he asked Cramer not to put all of the balance in the safe-deposit box—that he should keep some of it out "in the event I need it in a hurry." Thiel went to the washroom to remove the money belt. He handed it to Cramer on the street when they left the tavern. From the Twin Oaks Thiel and Cramer went to Thompson's Cafeteria where they conversed for about fifteen minutes. They agreed to meet there at 8 P. M. on June 25th. They parted. Thiel was followed and arrested.

Cramer returned home. He put Thiel's money belt in a shoe box. He put some of the money between the pages of a book. Later he put the balance in his bank, some in a savings account, most of it in his safe deposit box. He and Thiel had talked of Thiel's fiancée, Norma Kopp. At the first meeting Cramer had offered to write her on Thiel's behalf. He did so. He did not mention Thiel's name but asked her to come to his room, saying he had "sensational" news for her. Cramer appeared at Thompson's Cafeteria at 8 P. M. June 25th to keep his appointment with Thiel. He waited about an hour and a half. He returned the next night, June 26th, and definitely suspected Thiel had been arrested. Though he knew Thiel was registered at the Hotel Commodore, he made no attempt to get in touch with him there. When he returned to his room that night, Norma Kopp was waiting for him. She testified that he told her that Thiel was here; that "they came about six men with a U-boat, in a rubber boat, and landed in Florida"; that they "brought so

much money along from Germany, from the German government" he was keeping it in a safe-deposit box; and that they "get instructions from the sitz (hideout) in the Bronx what to do, and where to go." The next morning Cramer left a note for "William Thomas" at the Commodore saying that Norma Kopp had arrived and suggested a rendezvous. Later in the day Cramer was arrested. He told the agents of the F. B. I. that the name of the man who had been with him at Thompson's Cafeteria on the evening of June 23rd was "William Thomas," that "Thomas" had been working in a factory on the West Coast since March, 1941, and had not been out of the United States since then. He was asked if "Thomas" was not Thiel. He then admitted he was, saying that Thiel had used an assumed name, as he was having difficulties with his draft board. He also stated that the money belt Thiel gave him contained only $200 which Thiel owed him and that the $3,500 in his safe-deposit box belonged to him and were the proceeds from the sale of securities. After about an hour or so of the falsehoods, Cramer asked to speak to one of the agents alone. The request was granted. He then recanted his previous false statements and stated that he felt sure that Thiel had come from Germany by submarine on a mission for the German government and that he thought that mission was "to stir up unrest among the people and probably spread propaganda." He stated he had lied in order to protect Thiel.

The Court holds that this evidence is insufficient to sustain the conviction of Cramer under the requirements of the Constitution. We disagree.

## II

Article III, § 3 of the Constitution defines treason as follows: "Treason against the United States, shall consist only in levying War against them, or in adhering to

their Enemies, giving them Aid and Comfort. No Person shall be convicted of Treason unless on the Testimony of two Witnesses to the same overt Act, or on Confession in open Court."

The charge against Cramer was that of adhering. The essential elements of the crime are that Cramer (1) with treasonable intent (2) gave aid and comfort to the enemy.[1]

There was ample evidence for the jury that Cramer had a treasonable intent. The trial court charged the jury that "criminal intent and knowledge, being a mental state, are not susceptible of being proved by direct evidence, and therefore you must infer the nature of the defendant's intent and knowledge from all the circumstances." It charged that proof of criminal intent and knowledge is sufficient if proved beyond a reasonable doubt, and that the two witnesses are not necessary for any of the facts other than the overt acts. On that there apparently is no disagreement. It also charged: "Now, gentlemen, motive should not be confused with intent. If the defendant knowingly gives aid and comfort to one who he knows or believes is an enemy, then he must be taken to intend the consequences of his own voluntary act, and the fact that his motive might not have been to aid the enemy is no

---

[1] It is well established that the overt act and the intent are separate and distinct elements of the crime of treason under the Constitution. See *Ex parte Bollman,* 4 Cranch 75, 126; *United States* v. *Burr,* 25 Fed. Cas. 2, 13–14, No. 14,692a; *United States* v. *Lee,* 26 Fed. Cas. 907, No. 15,584; *United States* v. *Vigol,* 28 Fed. Cas. 376, No. 16,621; *United States* v. *Hanway,* 26 Fed. Cas. 105, 126, No. 15,299; *United States* v. *Greiner,* 26 Fed. Cas. 36, 39, No. 15,262; *United States* v. *Greathouse,* 26 Fed. Cas. 18, 22, No. 15,254; *United States* v. *Werner,* 247 F. 708, 709–710; *United States* v. *Fricke,* 259 F. 673, 677; *United States* v. *Robinson,* 259 F. 685, 690; *United States* v. *Stephan,* 50 F. Supp. 738, 742–743, aff'd 133 F. 2d 87, 99. Chief Justice Marshall ruled in *United States* v. *Burr,* 25 Fed. Cas. 52, 54, No. 14,692h, that it was in the discretion of the prosecutor to present evidence of the intent before proof of an overt act. And see *United States* v. *Lee, supra.*

defense. In other words, one cannot do an act which he knows will give aid and comfort to a person he knows to be an enemy of the United States, and then seek to disclaim criminal intent and knowledge by saying that one's motive was not to aid the enemy. So if you believe that the defendant performed acts which by their nature gave aid and comfort to the enemy, knowing or believing him to be an enemy, then you must find that he had criminal intent, since he intended to do the act forbidden by the law. The fact that you may believe that his motive in so doing was, for example, merely to help a friend, or possibly for financial gain, would not change the fact that he had a criminal intent." On that there apparently is no disagreement. A man who voluntarily assists one known or believed to be an enemy agent may not defend on the ground that he betrayed his country for only thirty pieces of silver. See *Hanauer* v. *Doane,* 12 Wall. 342, 347; *Sprott* v. *United States,* 20 Wall. 459, 463. "The consequences of his acts are too serious and enormous to admit of such a plea. He must be taken to intend the consequences of his own voluntary act." *Hanauer* v. *Doane, supra.* For the same reasons a man cannot slip through our treason law because his aid to those who would destroy his country was prompted by a desire to "accommodate a friend." [2] Loyalty to country cannot be subordinated to the amenities of personal friendship.

[2] *Carlisle* v. *United States,* 16 Wall. 147, 150–151; *Sprott* v. *United States,* 20 Wall. 459, 463–464; *United States* v. *Hodges,* 26 Fed. Cas. 332, 334, No. 15,374; Charge to Grand Jury—Treason, 30 Fed. Cas. 1032, 1034, No. 18,270; see also 1 East, Pleas of the Crown (1806) pp. 77–81; Warren, What is Giving Aid and Comfort to the Enemy (1918), 27 Yale L. J. 331, 343–345; Hazard and Stern, "Exterior Treason" (1938), 6 U. of Chi. L. Rev. 77, 84–85. But a mere showing of aid and assistance to an alien enemy permanently residing in the United States without any showing that the enemy alien has designs against the interests of the United States, does not without more establish an act of treason. See *United States* v. *Fricke,* 259 F. 673, 682.

Cramer had a traitorous intent if he knew or believed that Thiel and Kerling were enemies and were working here in the interests of the German Reich. The trial court charged that mere suspicion was not enough; but that it was not necessary for Cramer to have known all their plans. There apparently is no disagreement on that. By that test the evidence against Cramer was overwhelming. The conclusion is irresistible that Cramer believed, if he did not actually know, that Thiel and Kerling were here on a secret mission for the German Reich with the object of injuring the United States and that the money which Thiel gave him for safekeeping had been supplied by Germany to facilitate the project of the enemy. The trial court charged that if the jury found that Cramer had no purpose or intention of assisting the German Reich in its prosecution of the war or in hampering the United States in its prosecution of the war but acted solely for the purpose of assisting Kerling and Thiel as individuals, Cramer should be acquitted. There was ample evidence for the jury's conclusion that the assistance Cramer rendered was assistance to the German Reich, not merely assistance to Kerling and Thiel as individuals.

The trial judge stated when he sentenced Cramer that it did not appear that Cramer knew that Thiel and Kerling were in possession of explosives or other means for destroying factories in this country or that they planned to do that. He stated that if there had been direct proof of such knowledge he would have sentenced Cramer to death rather than to forty-five years in prison. But however relevant such particular knowledge may have been to fixing the punishment for Cramer's acts of treason, it surely was not essential to proof of his traitorous intent. A defendant who has aided an enemy agent in this country may not escape conviction for treason on the ground that he was not aware of the enemy's precise objectives. Knowing or believing that the agent was here on a mis-

sion on behalf of a hostile government, he could not, by simple failure to ask too many questions, assume that this mission was one of charity and benevolence toward the United States. But the present case is much stronger. For Cramer claims he believed the enemy agent's objective was to destroy national morale by propaganda and not to blow up war factories. Propaganda designed to cause disunity among adversaries is one of the older weapons known to warfare, and upon occasion one of the most effective. No one can read this record without concluding that the defendant Cramer knew this. He is an intelligent, if misguided, man. He has a quick wit sharpened by considerable learning of its kind. He is widely read and a student of history and philosophy, particularly Ranke and Nietzsche. He had been an officer of a pro-German organization, and his closest associate had been a zealous Nazi. He also had listened to German propagandists over the short wave. But, in any event, it is immaterial whether Cramer was acquainted with the efficacy of propaganda in modern warfare. Undoubtedly he knew that the German government thought it efficacious. When he was shown consciously and voluntarily to have assisted this enemy program his traitorous intent was then and there sufficiently proved.

The Court does not purport to set aside the conviction for lack of sufficient evidence of traitorous intent. It frees Cramer from this treason charge solely on the ground that the overt acts charged are insufficient under the constitutional requirement.

## III

The overt acts alleged were (1) that Cramer met with Thiel and Kerling on June 23rd, 1942, at the Twin Oaks Inn and "did confer, treat, and counsel" with them "for the purpose of giving and with the intent to give aid and comfort" to the enemy; (2) that Cramer "did accompany,

confer, treat, and counsel with" Thiel at the Twin Oaks Inn and at Thompson's Cafeteria on June 23rd, 1942, "for the purpose of giving and with intent to give aid and comfort" to the enemy; and (3) that Cramer gave false information of the character which has been enumerated to agents of the F. B. I. "for the purpose of concealing the identity and mission" of Thiel and "for the purpose of giving and with intent to give aid and comfort" to the enemy.

The Court concedes that an overt act need not manifest on its face a traitorous intention. By that concession it rejects the defense based on the treason clause which Cramer has made here. The Court says an overt act must "show sufficient action by the accused, in its setting, to sustain a finding that the accused actually gave aid and comfort to the enemy." It says, however, that the "protection of the two-witness rule extends at least to all acts of the defendant which are used to draw incriminating inferences that aid and comfort have been given." It adds, "Every act, movement, deed, and word of the defendant charged to constitute treason must be supported by the testimony of two witnesses. The two-witness principle is to interdict imputation of *incriminating acts* to the accused by circumstantial evidence or by the testimony of a single witness. The prosecution cannot rely on evidence which does not meet the constitutional test for overt acts to create any inference that the accused did other acts or did something more than was shown in the overt act, in order to make a giving of aid and comfort to the enemy." And when it comes to the overt acts of meeting and conferring with Thiel and Kerling the Court holds that they are inadequate since there was "no two-witness proof of what they said nor in what language they conversed." That is to say, reversible error is found because the two witnesses who testified to the fact that Cramer met twice with the saboteurs did not testify that Cramer

gave them information of "value to their mission" such as shelter, sustenance, supplies, encouragement or counsel.

That conclusion, we submit, leads to ludicrous results. The present case is an excellent example.

It is conceded that if the two witnesses had testified not only that they saw Cramer conferring with Thiel and Kerling but also heard him agree to keep Thiel's money and saw him take it, the result would be different. But the assumption is that since the two witnesses could not testify as to what happened at the meetings, we must appraise the meetings in isolation from the other facts of the record. Therein lies the fallacy of the argument.

In the first place, we fully agree that under the constitutional provision there can be no conviction of treason without proof of two witnesses of an overt act of treason. We also agree that the act so proved need not itself manifest on its face the treasonable intent. And as the Court states, such intent need not be proved by two witnesses. It may even be established by circumstantial evidence. For it is well established that the overt act and the intent are separate and distinct elements of the crime.[3] The "intent may be proved by one witness, collected from circumstances, or even by a single fact." *Case of Fries,* 9 Fed. Cas. 826, 909, No. 5126; *Respublica* v. *Roberts,* 1 Dallas 39; *United States* v. *Lee,* 26 Fed. Cas. 907, No. 15,584; *Trial of David Maclane,* 26 How. St. Tr. 721, 795–798. Acts innocent on their face, when judged in the light of their purpose and of related events, may turn out to be acts of aid and comfort committed with treasonable purpose. It is the overt act charged as such in the indictment which must be proved by two witnesses and not the related events which make manifest its treasonable quality and purpose. This, we think, is the correct and necessary conclusion to be drawn from the concession that the overt act need not on its face manifest the guilty purpose. The

---

[3] See note 1, *supra.*

grossest and most dangerous act of treason may be, as in this case, and often is, innocent on its face. But the ruling of the Court that the related acts and events which show the true character of the overt act charged must be proved by two witnesses is without warrant under the constitutional provisions, and is so remote from the practical realities of proving the offense, as to render the constitutional command unworkable. The treasonable intent or purpose which it is said may be proved by a single witness or circumstantial evidence, must, in the absence of a confession of guilt in open court, be inferred from all the facts and circumstances which surround and relate to the overt act. Inference of the treasonable purpose from events and acts related to or surrounding the overt act necessarily includes the inference that the accused committed the overt act with the knowledge or understanding of its treasonable character. To say that the treasonable purpose with which the accused committed the overt act may be inferred from related events proved by a single witness, and at the same time to say that so far as they show the treasonable character of the overt act, they must be proved by two witnesses, is a contradiction in terms. The practical effect of such a doctrine is to require proof by two witnesses, not only of the overt act charged which the Constitution requires but of every other fact and circumstance relied upon to show the treasonable character of the overt act and the treasonable purpose with which it was committed which the Constitution plainly does not require. Here, as in practically all cases where there is no confession in open court, the two are inseparable, save only in the single instance where the overt act manifests its treasonable character on its face. The Court thus in substance adopts the contention of the respondent, which it has rejected in words, and for all practical purposes requires proof by two witnesses, not only of the overt act but of all other elements of the crime save only in the

case where the accused confesses in open court. It thus confuses proof of the overt act with proof of the purpose or intent with which the overt act was committed and, without historical support, expands the constitutional requirement so as to include an element of proof not embraced by its words.

We have developed in the Appendix to this opinion the historic function of the overt act in treason cases. It is plain from those materials that the requirement of an overt act is designed to preclude punishment for treasonable plans or schemes or hopes which have never moved out of the realm of thought or speech. It is made a necessary ingredient of the crime to foreclose prosecutions for constructive treason. The treasonable project is complete as a crime only when the traitorous intent has ripened into a physical and observable act. The act standing alone may appear to be innocent or indifferent, such as joining a person at a table, stepping into a boat, or carrying a parcel of food. That alone is insufficient. It must be established beyond a reasonable doubt that the act was part of the treasonable project and done in furtherance of it. Its character and significance are to be judged by its place in the effectuation of the project. That does not mean that where the treasonable scheme involves several treasonable acts, and the overt act which is charged has been proved by two witnesses, that all the other acts which tend to show the treasonable character of the overt act and the treasonable purpose with which it was committed must be proved by two witnesses. The Constitution does not so declare. There is no historical support for saying that the phrase "two witnesses to the same overt act" may be or can be read as meaning two witnesses to all the acts involved in the treasonable scheme of the accused. Obviously one overt act proved by two witnesses is enough to sustain a conviction even though the accused has committed many other acts which can be proved by only one

witness or by his own admission in open court. Hence, it is enough that the overt act which is charged be proved by two witnesses. As the Court concedes, its treasonable character need not be manifest upon its face. We say that its true character may be proved by any competent evidence sufficient to sustain the verdict of a jury. Any other conclusion leads to such absurd results as to preclude the supposition that the two-witness rule was intended to have the meaning attributed to it.

When we apply that test to the facts of this case it is clear to us that the judgment of conviction against Cramer should not be set aside. The historical materials which we have set forth in the Appendix to this opinion establish that a meeting with the enemy may be adequate as an overt act of treason. Hale, Kelyng and Foster establish that beyond peradventure of doubt. Such a meeting might be innocent on its face. It might also be innocent in its setting, as Hale; Kelyng and Foster point out, where, for example, it was accidental. We would have such a case here if Cramer's first meeting with Thiel was charged as an overt act. For, as we have seen, Cramer went to the meeting without knowledge that he would meet and confer with Thiel. But the subsequent meetings were arranged between them. They were arranged in furtherance of Thiel's designs. Cramer was not only on notice that Thiel was here on a mission inimical to the interests of this nation. He had agreed at the first meeting to hide Thiel's money. He had agreed to contact Norma Kopp. He knew that Thiel wanted his identity and presence in New York concealed. This was the setting in which the later meetings were held. The meetings take on their true character and significance from that setting. They constitute acts. They demonstrate that Cramer had a liking for Thiel's design to the extent of aiding him in it. They show beyond doubt that Cramer had more than a treasonable intent; that that intent had moved from the realm of

thought into the realm of action. Since two witnesses proved that the meetings took place, their character and significance might be proved by any competent evidence.

In the second place, this judgment of conviction should be sustained even though we assume, *arguendo,* that Cramer's motion to dismiss at the end of the government's case should have been granted. The concern of the Court is that acts innocent on their face may be transformed into sinister or guilty acts by circumstantial evidence, by inference, by speculation. The rule announced by the Court is based on a desire for trustworthy evidence in determining the character and significance of the overt acts. But this is not a case where an act innocent on its face is given a sinister aspect and made a part of a treasonous design by circumstantial evidence, by inference, or by the testimony of a single witness for the prosecution. We know from Cramer's own testimony—from his admissions at the trial—exactly what happened.

We know the character of the meetings from Cramer's own admissions. We know from his own lips that they were not accidental or casual conferences, or innocent, social meetings. He arranged them with Thiel. When he did so he believed that Thiel was here on a secret mission for the German Reich with the object of injuring this nation. He also knew that Thiel was looking for a place to hide his money. Cramer had offered to keep it for Thiel and Thiel had accepted the offer. Cramer had also offered to write Norma Kopp, Thiel's fiancée, without mentioning Thiel's name. Cramer also knew that Thiel wanted his identity and his presence in New York concealed. Cramer's admissions at the trial gave character and significance to those meetings. Those admissions plus the finding of treasonable intent place beyond a reasonable doubt the conclusion that those meetings were steps in and part and parcel of the treasonable project.

Nor need we guess or speculate for knowledge of what happened at the meetings. We need not rely on circum-

stantial evidence, draw inferences from other facts, or resort to secondary sources. Again we know from Cramer's testimony at the trial—from his own admissions—precisely what transpired.

Cramer told the whole story in open court. He admitted he agreed to act and did act as custodian of the saboteur Thiel's money. He agreed to hold it available for Thiel's use whenever Thiel might need it. It is difficult to imagine what greater aid one could give a saboteur unless he participated in the sabotage himself. Funds were as essential to Thiel's plans as the explosives he buried in the sands of Florida. Without funds the mission of all the saboteurs would have soon ended or been seriously crippled. Cramer did not stop here. Preservation of secrecy was essential to this invasion of the enemy. It was vital if the project was to be successful. In this respect Cramer also assisted Thiel. He cooperated with Thiel in the concealment of Thiel's identity and presence in New York City. He did his best to throw federal officers off the trail and to mislead them. He made false statements to them, saying that Thiel's true name was "Thomas" and that Thiel had not been out of the country since the war began.

If Cramer had not testified, we would then be confronted with the questions discussed in the opinion of the Court. But he took the stand and told the whole story. It is true that at the end of the government's case Cramer moved to dismiss on the ground that the crime charged had not been made out. That motion was denied and an exception taken. If Cramer had rested there, the case submitted to the jury and a judgment of conviction rendered, we would have before us the problem presented in the opinion of the Court. But Cramer did not rest on that motion. He took the stand and told the whole story. Any defect in the proof was cured by that procedure. As stated in *Bogk* v. *Gassert*, 149 U. S. 17, 23, "A defend-

ant has an undoubted right to stand upon his motion for a nonsuit, and have his writ of error if it be refused; but he has no right to insist upon his exception, after having subsequently put in his testimony and made his case upon the merits, since the court and jury have the right to consider the whole case as made by the testimony. It not infrequently happens that the defendant himself, by his own evidence, supplies the missing link." And see *Sigafus* v. *Porter,* 179 U. S. 116, 121; *McCabe & Steen Co.* v. *Wilson,* 209 U. S. 275, 276; *Bates* v. *Miller,* 133 F. 2d 645, 647–648; 9 Wigmore on Evidence (3d ed. 1940) § 2496. And the rule obtains in criminal as well as in civil cases. *Sheridan* v. *United States,* 112 F. 2d 503, 504, rev'd on other grounds 312 U. S. 654; *Edwards* v. *United States,* 7 F. 2d 357, 359; *Baldwin* v. *United States,* 72 F. 2d 810, 812.

Why then must we disregard Cramer's admissions at the trial? Why must we assume, as does this Court, that those admissions are out of the case and that our decision must depend solely on the evidence presented by the government?

The Constitution says that a "confession in open court" is sufficient to sustain a conviction of treason. It was held in *United States* v. *Magtibay,* 2 Philippine Rep. 703, that a confession in open court to the overt acts charged in the indictment was not an adequate substitute for the testimony of two witnesses where the accused denied treasonable purpose. We need not go so far as to say that if the whole crime may be proved by an admission by the accused in open court, one of the ingredients of the offense may be established in like manner. See *Respublica* v. *Roberts, supra.* We do not say that if the government completely fails to prove an overt act or proves it by one witness only, the defect can be cured by the testimony of other witnesses or by the admissions of the accused. We do say that a meeting with the enemy is an act and

may in its setting be an overt act of treason. We agree that overt acts innocent on their face should not be lightly transformed into incriminating acts. But so long as overt acts of treason need not manifest treason on their face, as the Court concedes, the sufficiency of the evidence to establish the treasonable character of the act, like the evidence of treasonable intent, depends on the quality of that evidence whatever the number of witnesses who supplied it. There can be no doubt in this case on that score. Certainly a person who takes the stand in defense of a treason charge against him will not be presumed to commit perjury when he makes admissions against self-interest. Admissions against self-interest have indeed always been considered as the highest character of evidence. When two witnesses testify to the overt acts, why then are not admissions of the accused in open court adequate to establish their true character? Could the testimony of any number of witnesses more certainly or conclusively establish the significance of what was done? Take the case where two witnesses testify that the accused delivered a package to the enemy, the accused admitting in open court that the package contained guns or ammunition. Or two witnesses testify that the accused sent the enemy a message, innocuous on its face, the accused admitting in open court that the message was a code containing military information. Must a conviction be set aside because the two witnesses did not testify to what the accused admitted in open court? We say no. In such circumstances we have no examples of constructive treason. The intent is not taken for the deed. Proof of the overt act plus proof of a treasonable intent make clear that the treasonable design has moved out of the realm of thought into the field of action. And any possibility that an act innocent on its face has been transformed into a sinister or guilty act is foreclosed. For the significance and character of the act are supplied by the admissions from the lips of

the accused in open court. The contrary result could be reached only if it were necessary that the overt act manifest treason on its face. That theory is rejected by the Court. But once rejected it is fatal to the defense.

Cramer's counsel could not defend on the grounds advanced by the Court for the simple reason that the government having proved by two witnesses that Cramer met and conferred with the saboteurs, any possible insufficiency in the evidence which it adduced to show the character and significance of the meetings was cured by Cramer's own testimony. Cramer can defend only on the ground that the overt act must manifest treason, which the Court rejects, or on the ground that he had no treasonable intent, which the jury found against him on an abundance of evidence. Those are the only alternatives because concededly conferences with saboteurs here on a mission for the enemy may be wholly adequate as overt acts under the treason clause. They were proved by two witnesses as required by the Constitution. Any possible doubt as to their character and significance as parts of a treasonable project were removed by the defendant's own admissions in open court. To say that we are precluded from considering those admissions in weighing the sufficiency of the evidence of the true character and significance of the overt acts is neither good sense nor good law. Such a result makes the way easy for the traitor, does violence to the Constitution and makes justice truly blind.

### APPENDIX

The most relevant source of materials for interpretation of the treason clause of the Constitution is the statute of 25 Edw. III, Stat. 5, ch. 2 (1351) and the construction which was given it. It was with that body of law and the English and colonial experience under it that the Framers were acquainted. That statute specified seven offenses as

constituting treason. As respects the three offenses relevant to our present discussion, it provided as follows: if a man "doth compass or imagine the death" of the king, or "if a man do levy war" against the king in his realm, or if he "be adherent to the king's enemies in his realm, giving to them aid and comfort in the realm, or elsewhere, and thereof be probably attainted of open deed," he shall be guilty of treason.

Coke makes clear that the requirement of an overt act under the statute applies to all of the offenses included in the category of treason. See Coke, Institutes of the Laws of England, Third Part (5th ed., London, 1671), p. 5. There are indications by Coke that the overt act was a separate element of the offense and that its function was to show that the treasonable design had moved from thought to action. *Id.*, pp. 5, 12, 14, 38. Hale is somewhat more explicit. In discussing the offense of compassing the king's death he indicates that the overt act may be "indifferent" in character. He says, "That words may expound an overt-act to make good an indictment of treason of compassing the king's death, which overt-act possibly of itself may be indifferent and unapplicable to such an intent." 1 Hale, History of the Pleas of the Crown (Emlyn ed., London, 1736), p. 115. And he noted that "If there be an assembling together to consider how they may kill the king, this assembling is an overt-act to make good an indictment of compassing the king's death." *Id.*, p. 119. Kelyng states the same view. He cites *Sir Everard Digby's Case*, 1 St. Tr. 234, for the proposition that the meeting of persons and their consulting to destroy the king was itself an overt act. "It was resolved that where a Person knowing of the Design does meet with them, and hear them discourse of their traitorous Designs, and say or act nothing; This is High-Treason in that Party, for it is more than a bare Concealment, which is Misprision, because it sheweth his liking and approving of their De-

sign." He says that if a person not knowing their intent met with them, heard their plans, but said nothing and never met again, that would be only misprision of treason. "But if he after meet with them again, and hear their Consultations, and then conceal it, this is High-Treason. For it sheweth a liking, and an approving of their Design." Kelyng, A Report of Divers Cases in Pleas of the Crown (3d ed., London, 1873), p. *17. And see p. *21.

Foster is even more explicit. Like Coke he asserts that an overt act is required for each branch of treason covered by the Statute of Edward III. Foster, A Report of Some Proceedings on the Commission for the Trial of the Rebels in the Year 1746 in the County of Surry, and of other Crown Cases (2d ed., London, 1791), pp. 207, 237. He makes clear that an overt act is required not to corroborate the proof of a traitorous intent but to show that the treasonable project has left the realm of thought and moved into the realm of action. As respects the offense of compassing the death of the king, he says that the indictment "must charge, that the defendant did traitorously compass and imagine &c, and then go on and charge the several overt-acts as the means employed by the defendant for executing his traitorous purposes. For the compassing is considered as the treason, the overt-acts as the means made use of to effectuate the intentions and imaginations of the heart." *Id.*, p. 194. He refers to *Crohagan's Case* (Cro. Car. 332) where the defendant said "I will kill the King of England, if I can come at him" and the indictment added that he came to England for that purpose. "The traitorous intention, proved by his words, converted an action, innocent in itself, into an overt-act of treason." *Id.*, p. 202. And he also points out that "Overt-acts undoubtedly do discover the man's intentions; but, I conceive, they are not to be considered merely as evidence, but as the means made use of to effectuate the purposes of the heart." *Id.*, p. 203. And he adds, "Upon this

principle words of advice or encouragement, and, above all, consultations for destroying the King, very properly come under the notion of means made use of for that purpose. But loose words not relative to facts are, at the worst, no more than bare indications of the malignity of the heart." *Id.*, p. 204. He follows Kelyng in saying that attendance at a meeting with previous notice of the design to plot the death of the king or a return to a meeting after knowledge is gained of its treasonable purpose is treason, though bare concealment would not be if the defendant met the conspirators "accidentally or upon some indifferent occasion." *Id.*, p. 195.

It is true that these observations related to the offense of compassing or imagining the death of the king. But Foster indicates that the same test applies to make out the offense of adherence to the king's enemies. He says, "The offence of inciting foreigners to invade the kingdom is a treason of signal enormity. In the lowest estimation of things and in all possible events, it is an attempt, on the part of the offender, to render his country the seat of blood and desolation." *Id.*, pp. 196–197. This was said in connection with his discussion of *Lord Preston's* case, 12 How. St. Tr. 645, a landmark in the law of treason. Lord Preston was indicted both for compassing the death of the king and for adherence to his enemies. England was at war with France. The indictment alleged as an overt act of treason that on December 30, 1690, Lord Preston and others hired a small boat in the County of Middlesex to take them to another vessel which would carry them to France. The indictment alleged that the defendants were en route to France to communicate military information to the enemy. After the vessel set sail for France and when the vessel was in the County of Kent, the defendants were arrested. Papers containing information of value to the enemy were found on the person of Lord Preston's servant. Lord Preston contended that since the indictment laid the

treason in Middlesex there was no showing that a legally sufficient overt act of treason had been committed in that county. The court held, however, that the act of boarding the boat in Middlesex was a sufficient overt act of treason. Lord Chief Justice Holt ruled, "Now the question is, whether your lordship had a design to go to France with these papers? If you had, and if your lordship did go on ship-board in order to it, your taking boat in Middlesex in order to go on ship-board, is a fact done in the county of Middlesex." 12 How. St. Tr., p. 728.

Foster in his analysis of that case makes clear that taking the boat was an overt act sufficient not only to the crime of compassing the death of the king but also adherence to the enemies of the king. Foster, *op. cit.*, pp. 197–198. Yet on its face and standing alone the overt act of taking the boat was completely innocent and harmless. Only when it was related to other activities and events did it acquire a treasonable significance. Foster gives other indications that in case of adherence to the enemy the function of the overt act is no different than when the offense of compassing is charged. The crime of adherence is made out where the defendant attempts to send money, provisions, or information to the enemy "though the money or intelligence should happen to be intercepted. For the party in sending did all he could: the treason was complete on his part, though it had not the effect he intended." *Id.*, p. 217.

Blackstone emphasizes the desirability of a restrictive interpretation of the offense of treason, condemning "constructive" treason and "newfangled treasons" which imperil the liberty of the people. 4 Blackstone, Commentaries (6th ed. Dublin 1775), pp. 75, 83, 85, 86. Blackstone recognizes the distinction between evidence of intent and the overt act: "But, as this compassing or imagination is an act of the mind, it cannot possibly fall under any judicial cognizance, unless it be demonstrated by

some open, or *overt,* act. And yet the tyrant Dionysius is recorded to have executed a subject, barely for dreaming that he had killed him; which was held for a sufficient proof, that he had thought thereof in his waking hours. But such is not the temper of the English law; and therefore, in this, and the three next species of treason, it is necessary that there appear an open or *overt* act of a more full and explicit nature, to convict the traitor upon." *Id.,* p. 79. When it comes to the offense of adherence to the enemy he gives examples of adequate overt acts, some of which may be innocent standing by themselves. "This must likewise be proved by some overt act, as by giving them intelligence, by sending them provisions, by selling them arms, by treacherously surrendering a fortress, or the like." *Id.,* pp. 82–83. His analysis supports the views of Foster that the function of the overt act is to show that the traitorous project has moved out of the realm of thought into the realm of action.

The English cases prior to 1790 support this thesis. We have mentioned *Lord Preston's* case. In the case of *Captain Vaughan,* 13 How. St. Tr. 485, the principal charge against the defendant was adhering to the enemy, though levying war was also alleged. The substance of the overt act of adherence was that when France and England were at war the defendant cruised in a small ship of war, in English waters, in the service of France with intent to take the king's ships. It was objected that the overt act alleged was insufficient "for it is said only he went a-cruising; whereas they ought to have alledged that he did commit some acts of hostility, and attempted to take some of the king's ships; for cruising alone cannot be an overt-act; for he might be cruising to secure the French merchant-ships from being taken, or for many other purposes, which will not be an overt-act of treason." p. 531. But Lord Chief Justice Holt ruled: "I beg your pardon. Suppose the French king, with forces, should

come to Dunkirk with a design to invade England; if any one should send him victuals, or give him intelligence, or by any other way contribute to their assistance, it would be high-treason in adhering to the king's enemies." p. 531. And Lord Chief Justice Treby added: "The indictment is laid for adhering to, and comforting and aiding the king's enemies. You would take that to be capable to be construed adhering to the king's enemies in other respects; but I take it to be a reasonable construction of the indictment, to be adhering to the king's enemies in their enmity. What is the duty of every subject? It is to fight with, subdue, and weaken the king's enemies: and contrary to this, if he confederate with, and strengthen the king's enemies, he expressly contradicts this duty of his allegiance, and is guilty of this treason of adhering to them. But then you say here is no aiding unless there were something done, some act of hostility. Now here is going aboard with an intention to do such acts; and is not that comforting and aiding? Certainly it is. Is not the French king comforted and aided, when he has got so many English subjects to go a cruising upon our ships?" pp. 532–533. And he went on to say that acts which "give the enemy heart and courage to go on with the war" are acts of adherence even though the whole project was "an unprosperous attempt." p. 533. He emphasized that the lack of success was immaterial, for "if they have success enough, it will be too late to question them." p. 533. This is plain recognition not only that the aid and comfort may be given though the project is thwarted,[1] but also that aid and comfort is given when the enemy is encouraged and his morale bolstered as well as when materials are furnished.

---

[1] Accord: *William Gregg,* 14 How. St. Tr. 1371; *Trial of Dr. Hensey,* 19 How. St. Tr. 1341. Both of these involved indictments for compassing and adhering, the overt acts being letters of intelligence intercepted before they reached the enemy.

The case of *Francis De la Motte,* 21 How. St. Tr. 687, is also somewhat illuminating. The indictment charged compassing and adhering. The overt acts included writing and causing to be written documents conveying intelligence to the enemy, procuring a messenger to carry the documents, and hiring a person to gather and to send the intelligence. Mr. Justice Buller in his charge to the jury said: "The sending intelligence, or collecting intelligence, for the purpose of sending it to an enemy, to enable them to annoy us or to defend themselves, though it be never delivered to the enemy; or the hiring a person for that purpose, is an overt act of both the species of treason which I am stating to you from this indictment." p. 808.

These materials indicate that the function of the overt act was to make certain that before a conviction for the high crime of treason may be had more than a treasonable design must be established; it must be shown that action pursuant to that design has been taken. The treason of adherence was defined essentially in terms of conduct for it involved giving aid and comfort. Yet the attempt alone was sufficient; the aid and comfort need not have been received by the enemy. Conduct amounting to aid and comfort might be innocent by itself—such as collecting information or stepping into a boat. It was sufficient if in its setting it reflected a treasonable project. It need not entail material aid; comfort or encouragement was sufficient. The only requirement was that it definitely translate treasonable thought into action which plainly tended to give aid and comfort to the enemy.

These materials likewise support the contention of the government that the overt act need not manifest treason on its face.

The history of treason in this country down to the Constitution has been recently developed in Hurst, Treason in the United States, (1944) 58 Harv. L. Rev. 226. We

do not stop to explore that field. But Professor Hurst's researches make plain that prior to the revolution the influence of 25 Edw. III was strong in the colonies and that, if anything, the scope of the offense was somewhat broadened. The Revolution changed matters. The Continental Congress recommended more restrictive legislation to the colonies which limited treason to levying war and adhering to the enemy, giving him aid and comfort. *Id.*, p. 247. No form of treason by compassing was retained. *Id.*, p. 252. Distrust of constructive treason was beginning to be voiced (*id.*, pp. 253, 254) though in some colonies treason was so broadly defined as to include mere utterances of opinions. *Id.*, pp. 266 *et seq.*

The proceedings of the Constitutional Convention of 1787 have been related in the opinion of the Court. And see Hurst, Treason in the United States, 58 Harv. L. Rev. 395. As the Court points out the Framers were anxious to guard against convictions of the innocent by perjury and to remove treason from the realm of domestic, political disputes. Franklin expressed concern on the first in his statement that "prosecutions for treason were generally virulent; and perjury too easily made use of against innocence." 2 Farrand, Records of the Federal Convention, p. 348. Madison and Jefferson [2] both expressed distrust of treason for its long history of abuse in the political field. Madison said in language somewhat reminiscent of Blackstone: "As treason may be committed

---

[2] In a letter of April 24, 1792, Jefferson, then Secretary of State, wrote: "Treason, . . . when real, merits the highest punishment. But most codes extend their definitions of treason to acts not really against one's country. They do not distinguish between acts against the *government* and acts against the *oppressions of the government;* the latter are virtues; yet they have furnished more victims to the executioner than the former; because real treasons are rare; oppressions frequent. The unsuccessful strugglers against tyranny, have been the chief martyrs of treason laws in all countries." See 8 Writings of Thomas Jefferson (Library ed. Wash. 1903) p. 332.

against the United States, the authority of the United States ought to be enabled to punish it. But as new-fangled and artificial treasons have been the great engines by which violent factions, the natural offspring of free government, have usually wreaked their alternate malignity on each other, the convention have, with great judgment, opposed a barrier to this peculiar danger, by inserting a constitutional definition of the crime, fixing the proof necessary for conviction of it, and restraining the Congress, even in punishing it, from extending the consequences of guilt beyond the person of its author." The Federalist, No. XLIII.

The requirement of two witnesses was not novel. England had long had that rule. 9 Holdsworth, A History of English Law (2d ed. 1938) p. 207. The novelty was in the requirement that there be two witnesses to the "same" overt act. Moreover, there was no novelty in the offenses which were included in the definition of treason. Adhering to the enemy, giving him aid and comfort, like levying war, had long been embraced in the English crime of treason, as we have seen. But there was novelty in the narrow definition of treason which was adopted—a restrictive definition born of the fear of constructive treason and distrust of treason as a political instrument.

There is, however, no evidence whatever that the offense of adhering to the enemy giving him aid and comfort was designed to encompass a narrower field than that indicated by its accepted and settled meaning. Nor is there the slightest indication that the kind or character of overt acts required were any different than those which had long been recognized or accepted as adequate. The overt act was of course "intended as a distinct element of proof of the offense in addition to intent." Hurst, *op. cit.*, pp. 415–416. But any suggested difference from the body of law which preceded vanishes when two witnesses to the same overt act are produced. As respects the point vital

for our decision it is therefore quite inaccurate for the Court to conclude that our treason clause "taught a concept that differed from all historical models." That would be true only if there was a purpose to depart from the concept of adhering to the enemy or the concept of overt acts which had become ingrained in the antecedent English law. We find no such purpose.